**Harry BELLAS, Plaintiff,**

v.

**CBS, INC. and Westinghouse Pension Plan, Defendants.**

**No. CIV. A. 98–1455.**

United States District Court, W.D. Pennsylvania.

June 29, 1999.

Goldberg, Persky, Jennings & White, John T. Tierney, Schwartz, Steinsapir, Dohrmann & Sommers, William T. Payne, Pittsburgh, PA, for Plaintiff.

Pepper, Hamilton, Henry W. Ewalt, CBS Corp., Dennis Derr, Pittsburgh, PA, Jones, Day, Reavis & Pogue, Andrew Kramer, Washington DC, for Defendants.

### *OPINION* and *ORDER OF COURT*

AMBROSE, District Judge.

Pending before the Court is the Motion for Partial Summary Judgment of Plaintiff Harry Bellas ("Bellas" or "Plaintiff"). Plaintiff's Complaint alleges a violation of ERISA § 204(g), 29 U.S.C. § 1054(g) both by Defendants CBS, Inc. ("CBS") and the Westinghouse Pension Plan ("the Plan") (collectively "Defendants") and an ERISA breach of fiduciary duty claim by Defendant CBS. For the reasons set forth below, the Plaintiff's Motion for Partial Summary Judgment is granted.

### *STANDARD OF REVIEW*

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion,

against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. *International Raw Materials, Ltd. v. Stauffer Chemical Co.,* 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.1987). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material when it might affect the outcome of the suit under the governing law. *Id.* Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

### FACTS

Viewed in a light most favorable to Defendants, following are the material facts of record.[1]

Plaintiff alleges that Westinghouse Electric Corporation ("Westinghouse"), the predecessor by name change to Defendant CBS, impermissibly amended the Westinghouse Pension Plan ("the Plan") by first narrowing and then eliminating entirely a "Special Retirement Provision" applicable when a senior employee is terminated as a result of a "Permanent Job Separation." Plaintiff contends that said amendment has the effect of eliminating or reducing an early retirement benefit or an early retire-

ment-type subsidy in contravention of the Retirement Equity Act ("REA") Amendments to ERISA, 29 U.S.C. § 1054(g) and § 411(d)(6) of the Internal Revenue Code, 26 U.S.C. § 411(d)(6). Plaintiff further claims that in adopting and implementing said amendment, CBS violated its fiduciary duties of acting solely in the interest of plan participants and beneficiaries, of administering the Plan in accordance with both the governing documents and instruments and ERISA, and of exercising care, prudence, and diligence in the performance of its responsibilities and thereby violated ERISA and the IRC.

The pre–1994 version of the Plan provided in Section 20 of the Plan a Special Retirement Provision for employees of CBS meeting stated age and service requirements who were terminated as a result of a "Permanent Job Separation" (the "PJS benefit"). More specifically, in Section 20 of the pre–1994 version of the Plan, which is entitled, "Special Retirement Provisions," the Plan provided in relevant part:

> B. 1. An Employee whose employment is terminated as a result of a Permanent Job Separation, who at the time of such Permanent Job Separation does not satisfy any of the requirements for retirement pursuant to Section 2 of the Plan, may retire on his Special Retirement Date or on the first day of any month following his Special Retirement Date if, by the end of the calendar year in which he is separated, he would have satisfied one of the age-and-service combinations set forth below had he remained continuously employed to the end of such year:
>
> — Age 50 or over with twenty-five (25) or more years of Eligibility Service,
>
> — Age 51 or over with twenty-two (22) or more years of Eligibility Service,

---

**1.** Although I will for purposes of this motion for summary judgment view any disputed facts in a light most favorable to Defendants, in reality, the facts relevant to this action are essentially undisputed by the parties.

— Age 52 or over with nineteen (19) or more years of Eligibility Service,

— Age 53 or over with sixteen (16) or more years of Eligibility Service,

— Age 54 or over with thirteen (13) or more years of Eligibility Service,

— Age 55 or over with ten (10) or more years of Eligibility Service,

2. The amount of monthly pension payable to an Employee who satisfies the requirements set forth in Subsection 20.-B.1 above shall be the sum of (a), (b) and (c) below:

(a) Any amounts computed pursuant to Section 4 of the Plan [Section 4 is entitled "Normal Retirement Pension"].

(b) Ten ($10.00) dollars multiplied by his Credited Service.

(c) If the Employee had twenty-five (25) years of eligibility Service and his Special Retirement Date is on or before September 1, 1994, an additional $100.

The amounts calculated in accordance with Subsection 20.B.2 above shall be based on the provisions of the Plan in effect on the Employee's Special Retirement Date.

3. The amount calculated in accordance with Subsection 20.B.2 (a) shall be payable for the lifetime of the Employee and shall be subject to all of the optional forms of payments described in Section 10.

4. The amounts calculated in accordance with Subsections 20.B.2 (b) and 20.B.2 (c) shall be payable up to and including the month in which the Employee attains his 62nd birthday. These amounts shall not be subject to any of the optional forms of payment described in Section 10, except the Lump Sum form described in Subsection 10.C.5.

Pre–1994 version of the Plan, Section 20, pp. 43–44. The term "Permanent Job Separation" was defined in the pre–1994 version of the Plan in pertinent part as meaning "the termination of the employment of an Employee ... through no fault of his own through lack of work for reasons associated with the business for whom [the employer] determines there is no reasonable expectation of recall." *Id.* at Section 1, p. 7. Further, the Summary Plan Description with respect to this provision explains:

[t]he amount of your special retirement pension is the full amount you have earned to the date you are permanently separated. There are no reductions applied to your pension, even though you are retiring early. If you are under age 62, you receive a monthly early retirement supplement of $10 for each year of credited service. This supplement stops when you turn age 62.

If you have at least 25 years of eligibility service, you receive an additional $100 per month until you turn age 62. This additional $100 per month is available only if your special retirement pension begins on or before September 1, 1994.

Pre–1994 version of the Plan Summary Plan Description, p. 14.

An amendment to the Plan, adopted by CBS on January 1, 1994 ("the Amendment"), altered participants' entitlement to the PJS benefit under the Plan in two respects: (1) the Amendment made it harder to qualify for the PJS benefit after January 1, 1997, by narrowing the definition of "Permanent Job Separation" to apply only if an employee's employment termination was due to a job movement, product line relocation, or location closedown and (2) the Amendment eliminated the PJS benefit *in toto* for terminations on or after September 1, 1998.[2] More specifi-

---

**2.** With respect to the total elimination of the Special Retirement Pension after September 1, 1998, Defendants explain in their Opposition to Plaintiff's Motion for Summary Judgment, without providing any supporting documentation, that "[t]he Plan was amended in

1998 to extend the 1994 PJS [Permanent Job Separation] benefit because of job movement or product-line relocation, or location closedown until the year 2000." Defendants' Opposition to Plaintiff's Motion for Summary Judgment, p. 6 n. 7. For purposes of deciding

cally, the definition of the term "Permanent Job Separation" was defined in the 1994 version of the Plan, in relevant part, as follows:

> Permanent Job Separation means, for periods prior to January 1, 1997, the termination of the employment of an Employee with an Employer ... through no fault of his own for lack of work for reasons associated with the business for whom such Employer ... determines, on a uniform and nondiscriminatory basis, that there is no reasonable expectation of recall.
>
> .    .    .    .    .
>
> For periods on or after January 1, 1997 and before September 1, 1998, a Permanent Job Separation means solely the termination of the employment of an Employee with an Employer ... because of job movement or product-line relocation, or location closedown, as those terms are defined below.... Layoffs due to adjustments in the workforce caused by changes in production requirements, manufacturing processes, sales volume, inventory levels, make or buy decisions, decisions to discontinue a product line, or any other reasons associated with the business shall not be a job movement or product-line relocation.... In no event shall a Permanent Job Separation occur after August 31, 1998.

1994 version of the Plan, pp. 12–13.

Plaintiff was employed by CBS in the nuclear division of CBS from 1964 until December 31, 1997. He was a participant in the Plan at all relevant times prior thereto, including at the time of the adoption of the Amendment. Plaintiff was notified of the Amendment either in late 1994 or when the January 1, 1995 Summary Plan Description of the Plan was distributed.

Plaintiff's employment was terminated by CBS on December 31, 1997, through no

fault of his own, through lack of work, for reasons associated with CBS's business and with no reasonable expectation of recall. At the time of his termination, Plaintiff was over 50 years of age and had thirty (30) years of service with Westinghouse/CBS.

Under the pre–1994 version of the Plan, upon his termination, Plaintiff would have satisfied all of the conditions necessary to receive the PJS benefit (i.e. age, years of service, and reason for termination).

The pre–1994 version of the Plan also contained a "Normal Retirement Pension" provision and an "Early Retirement Pension" provision. Pre–1994 version of the Plan, Sections 4–5, pp. 11–17.

### LEGAL ANALYSIS OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In his Motion for Partial Summary Judgment, Plaintiff asks this Court to rule as a matter of law that the Amendment in question violates the REA amendments to ERISA, set forth at 29 U.S.C. § 1054(g), and § 411(d)(6) of the Internal Revenue Code. I will address Plaintiff's motion for partial summary judgment as to the ERISA § 204(g) issue but as I do not read Plaintiff's Complaint to have alleged that Defendants violated 26 U.S.C. § 411(d)(6), I will not address Plaintiff's Motion to the extent it asks the Court to find as a matter of law that Defendants violated § 411(d)(6).

29 U.S.C. § 1054(g) is entitled "Decrease of accrued benefits through amendment of plan," and provides:

> (1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan ....
>
> (2) For the purposes of paragraph (1), a plan amendment which has the effect of—

---

this motion, it is immaterial whether or not the Amendment totally eliminates the Special Retirement Pension after September 1, 1998 because it is not disputed by Defendants that

by amending the Plan to narrow the definition of "Permanent Job Separation," a participant's ability to receive a PJS benefit under the Plan was reduced.

(A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in the regulations), or

(B) eliminating an optional form of benefit,

with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfied (either before or after the amendment) the preamendment conditions for the subsidy.

29 U.S.C. § 1054(g).

In support of his position, Plaintiff argues that the PJS benefit qualifies both as (1) "an early retirement benefit" and "a retirement-type subsidy" as those terms are used in ERISA § 204(g) and therefore, by amending the Plan to reduce and then eliminate the PJS benefit, Defendants have violated ERISA § 204(g). Plaintiff's Reply to Defendant's Opposition to Motion for Partial Summary Judgment ("Plaintiff's Reply Brief"), p. 1. "Since the benefit commences earlier than 'normal retirement age' (i.e., as early as age 50 instead of the 'normal' age of 65), it is an 'early retirement benefit.' And ... it is a 'retirement-type subsidy' since, under the provision, the participant receives the *same* monthly amount *for life* which he would have received at age 65 under the normal retirement provision." *Id.* at pp. 1–2.

In response to Plaintiff's Motion for Partial Summary Judgment, Defendants argue that the 1994 Amendment to the PJS benefits did not violate the anti-cutback rule of ERISA § 204(g) because "[t]he anti-cutback rule does not protect benefits that are triggered by a contingent event outside the control of the employee" and "[t]he anti-cutback rule also does not protect plant shutdown and similar workforce reduction benefits that do not continue after normal retirement age." Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defendant's Reply Brief"), pp. 21–22. *See also id.* at p.

2 ("[g]iven the wholly contingent nature of the Plan's PJS benefit, it is not an early retirement benefit. Because it is a contingent benefit and because the subsidy it provides ceases at normal retirement age, it is not a retirement-type subsidy. Consequently, as a matter of law, the PJS benefit may be amended—as was done in 1994—or even reduced or eliminated completely."). Notably, with respect to their argument that under the pre–1994 version of the Plan, the PJS benefit ended at age 65 the Defendants explain:

For example, under the 1992 Plan, an employee age 50 or older with at least 25 years of service who was terminated as part of a permanent job separation before September 1, 1994 became entitled to a monthly supplemental benefit of $350, plus an amount equal to the unreduced normal retirement benefit. Once an employee reached age 62, the $350 component of this subsidized benefit ended and the employee thereafter received only a monthly amount equal to the unreduced normal retirement benefit payable at age 65. Then, once the employee reached age 65, this pre-retirement subsidy ceased, and he or she received only the Plan's "normal retirement" benefit. It is a key fact that, when the employee reached age 65, he or she was entitled to nothing more than their normal retirement benefit.

*Id.* at p. 6.

In reply to Defendant's "contingent" argument, Plaintiff contends that § 204(g) "mandates protection if the participant eventually 'satisfies ... the pre-amendment *conditions*' either before or after the amendment" and "does *not* specify that such 'conditions' can only be age and service." Plaintiff's Reply Brief, p. 2 (emphasis in original). Concerning the Defendant's contention that § 204(g) does not protect benefits that do not continue after normal retirement age, the Plaintiff argues that this argument is not applicable to the PJS benefit because said benefit is not a plant shutdown benefit and does continue

after normal retirement age. *Id.* at pp. 9–13.

Thus, the issue before this Court pursuant to Plaintiff's Motion for Partial Summary Judgment is whether the PJS benefit contained in the pre–1994 version of the Plan constitutes either an "early retirement benefit" or a "retirement-type subsidy" that was protected from reduction or elimination by plan amendment.

### A. Retirement–Type Subsidy.

I address first whether the PJS benefit qualifies as a retirement-type subsidy that was protected from reduction or elimination by plan amendment.

The United States Court of Appeals has provided some guidance on the issue at hand. In *Dade v. North American Philips Corporation,* 68 F.3d 1558 (3d Cir. 1995), the Third Circuit court examined a provision of a pension plan that provided that the plan's early retirement benefits would not be reduced [by 0.3% for each month their retirement preceded the normal retirement age] if the sum of the participant's age and years of eligible service was at least eighty-five. In pertinent part, the *Dade* court first explained that the benefit was an early retirement subsidy because "more is provided ... than any reasonable actuarial equivalent of the plan's normal retirement benefit." *Id.* at 1562, 1562 n. 1, *quoting,* Stephen R. Bruce, *Pension Claims Rights and Obligations,* 285 (1993), *citing, Ashenbaugh v. Crucible, Inc.,* 854 F.2d 1516, 1521 n. 6, 1528 n. 12 (3d Cir.1988), *cert. den'd,* 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1019 (1989).[3] The *Dade* court further held concerning the meaning of § 204(g) that:

> [a]fter 1984, a plan sponsor could prospectively eliminate an early retirement benefit by amendment, but under § 204(g) the amendment could not adversely affect the early retirement benefit of a plan participant who satisfied the pre-amendment conditions for the benefit either before or after the amendment. Thus, if [the plan sponsor] had adopted such an amendment, it would have had to allow those employees who remained in its employ after the amendment to "grow into" the benefit ....

*Dade,* 68 F.3d at 1562. In *Hein v. F.D.I.C.,* 88 F.3d 210 (3d Cir.1996), *cert. den'd,* 519 U.S. 1056, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997), the appellate court explained that "ERISA § 204(g)(2) mandates accrual of [a participant's] unreduced early retirement benefits only if [the participant] at some point 'satisfied ... the preamendment conditions for the subsidy'." *Id.* at 213 (internal citation omitted).

The following legislative history concerning the amendment of § 204(g) in 1984 to include the protection of, *inter alia,* "retirement-type subsidies," is also instructive in interpreting what constitutes a retirement-type subsidy for purposes of § 204(g) and § 411(d)(6). First, the legislative history explains that the amendment to § 204(g): "generally protects the accrual of benefits with respect to participants who have met the requirements for a benefit as of the time a plan is amended and participants who subsequently meet the preamendment requirements. The bill does not, however, prevent the reduction of a subsidy in the case of a participant who, at the time of separation from service (whether before or after the plan amendment) has not met the preamendment requirements." S.Rep. No. 575, 98th Cong., 2d Sess. 28, reprinted in 1984 U.S.Code Cong. & Admin. News 2547, 2574. The legislative history of the 1984 amendment to § 204(g) further provides:

> [t]he bill provides that the term "retirement-type subsidy" is to be defined by Treasury regulations. The Committee

---

**3.** The *Ashenbaugh* court explained that the legislative history of § 204(g), as amended, defines a benefit subsidy as "the excess in value of a benefit over the actuarial equivalent of the normal retirement benefit" and that because the benefit at issue in *Ashen-* *baugh* provided a value in excess of the amount that would have been available to a retiring employee under the comparable actuarially-reduced normal retirement benefit provision, the excess value was a subsidy. *Id.* at 1521 n. 6.

intends that under these regulations, a subsidy that continues after retirement is to be considered a retirement-type subsidy. The committee expects, however, that a qualified disability benefit, a medical benefit, a social security supplement, a death benefit (including life insurance ), or a plant shutdown benefit (that does not continue after retirement age) will not be considered a retirement-type subsidy. The committee expects that Treasury regulations will prevent the recharacterization of retirement-type benefits as benefits that are not protected by the provision.

*Id.* at S.Rep. No. 575, 98th Cong., 2d Sess. 30, reprinted in 1984 U.S.Code Cong. & Admin. News 2547, 2576.

26 U.S.C. § 411(d)(6),[4] § 411(d)(6) of the Internal Revenue Code ("IRC"), is essentially the same statute as § 204(g). Qualified pension plans such as the instant Plan must comply with both the Internal Revenue Code and ERISA. As explained by the Third Circuit court in *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1144 (3d Cir. 1993), *cert. den'd.*, 511 U.S. 1004, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994), *cert. den'd*, 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994), "[w]hen interpreting ERISA's provisions we sometimes have the benefit of another source." Section 204(g) ... has a mirror-like counterpart in the Internal Revenue Code ("IRC"). *See* 26 U.S.C. § 411(d)(6). Therefore, when interpreting

§ 204(g) of ERISA, in addition to the statute's legislative history, we may also look for guidance to sources which interpret its IRS counterpart. *Id.* at 1144. Accordingly, Internal Revenue Service ("IRS") General Counsel Memorandum ("GCM") 39869,[5] which examined "[w]hether shutdown benefits may be provided in a qualified pension plan" and "[i]f shutdown benefits may be provided in a qualified plan, are they accrued benefits that are protected under section 411(d)(6) and subject to the minimum survivor annuity requirements under sections 401(a)(11) and 417," is also of assistance in the case at bar. GCM 39869 provides, in relevant part, the following conclusions and supporting analysis:

> [s]hutdown benefits that are retirement-type benefits [for example, benefits that become payable because of a plant shutdown and are in the form of annuity payments that continue after retirement age] ... become accrued benefits and therefore are protected benefits under section 411(d)(6) upon the occurrence of the event that triggers the right to payment of benefits (i.e., the contingent event).

> .    .    .    .    .

> shutdown benefits may continue beyond normal retirement age, i.e. retirement-type benefits. Generally, shutdown benefits provide an incentive to employees who are at or near normal retirement

---

4. 26 U.S.C. § 411(d)(6) states:
   (d) Special Rules-
   (6) Accrued benefit not to be decreased by amendment-
   (A) in general.—A plan shall be treated as not satisfying the requirements of this section if the accrued benefit of a participant is decreased by an amendment of the plan

   . . . .

   (B) Treatment of certain plan amendments.—For purposes of subparagraph (A), a plan amendment which has the effect of—
   (i) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
   (ii) eliminating an optional form of benefit,
   with respect to benefits attributable to service before the amendment shall be treated

as reducing [accrued] benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy.
26 U.S.C. § 411(d)(6).

5. Plaintiff emphasizes that the GCM states that "[t]his document is not to be relied upon or otherwise cited as precedent by taxpayers." *Id.* While this is true, understanding how the Internal Revenue Service, the agency responsible for enforcing the Internal Revenue Code, has interpreted IRC § 411(d)(6) certainly is of assistance in deciding the difficult inquiry currently before the Court.

age to retire at the time of the plant shutdown. For example, an employer may reduce the age or service eligibility requirements for the normal retirement benefit, or may supplement the accrued benefit of the individual.

. . . . .

The provision of shutdown benefits in the form of a retirement-type benefit in a qualified pension plan was contemplated in the legislative history of the Retirement Equity Act of 1984 ("REA") and the Omnibus Budget Reconciliation Act of 1987 ("OBRA '87" ").

The legislative history of section 301 of REA, which amended section 411(d)(6), added the term "retirement-type subsidy" and discussed its intended meaning by stating that "a subsidy that continues after retirement is generally to be considered a retirement-type subsidy" and therefore, ". . . A SHUTDOWN BENEFIT (THAT DOES NOT CONTINUE AFTER RETIREMENT AGE) WILL NOT BE CONSIDERED A RETIREMENT–TYPE SUBSIDY." S.Rep. No. 575, 98th Cong., 2d Sess. 30 (1984) emphasis added. This language suggests that shutdown benefits that continue after retirement age are retirement-type benefits . . . .

Section 412(l), as added by section 9303(a)(1) of OBRA '87, provides for additional funding requirements for "unpredictable contingent event benefits." In discussing the meaning of this term, the legislative history states that these benefits are "contingent on an event other than age, service, compensation, death, or disability, or an event which is reasonably predictable (as determined by the Secretary)" and includes "benefits that depend on contingencies that, like facility shutdowns or reductions or contractions in the workforce, are not reliably and reasonably predictable. This event is not limited to events that are similar to shutdowns or reductions in [work] force." S.Rep. No. 63, 100th Cong., 1st Sess. 171–172 (1987). See also H.R.Rep. No. 391, 100th Cong., 1st Sess. 987 (1987) which provides similar language. It is clear from the legislative history that the special funding rules for unconditional contingent event benefits apply to shutdown benefits.

. . . . .

A. Under section 411(d)(6), an accrued benefit is a protected benefit and therefore the amount of the accrued benefit may not be decreased or eliminated.

Section 411(d)(6) provides that a qualified pension plan shall not be treated as satisfying section 411 . . . if the accrued benefit of a participant is decreased or eliminated.

. . . . .

if provided as retirement-type benefits, shutdown benefits are accrued benefits and therefor protected under section 411(d)(6).

. . . . .

B. Shutdown benefits that are retirement-type benefits . . . become an accrued benefit and therefore protected under section 411(d)(6) upon the occurrence of the event that triggers the right to the benefits (i.e., the contingent event). This is consistent with the treatment of shutdown benefits as unpredictable contingent event benefits for purposes of the funding requirements under section 412.

In determining a defined benefit plan's current liability for purposes of the funding requirements under section 412, unpredictable contingent event benefits are not taken into account until the event on which the benefit is contingent occurs. See I.R.C. section 412(l)(7)(B). The legislative history of section 412(l) is clear that shutdown benefits are unpredictable contingent event benefits. . . . Accordingly, because shutdown benefits are considered to be unpredictable contingent event benefits under section 412(l), a qualified pension plan is not required to fund for shutdown benefits until a triggering event occurs.

**508**

Thus, treating a shutdown benefit as an accrued benefit and therefore as a section 411(d)(6) protected benefit at the time that the triggering event occurs is consistent with the treatment of this benefit as an unpredictable contingent event benefit for purposes of the additional funding requirements under sections 412(*l* ) and 412(c)(7).

. . . . .

The plan's definition of the shutdown benefit will generally determine the occurrence of the contingent event. . . . The plan's description of a specific event is also the triggering event for determining when the shutdown benefit becomes a section 411(d)(6) protected benefit.

> C. If offered as a retirement-type subsidy in a qualified pension plan, shutdown benefits are accrued benefits that must be provided for in the form of a qualified joint and survivor annuity ("QJSA") and provide for a qualified preretirement survivor annuity ("QPSA").

. . . . .

For purposes of section 411, a retirement-type subsidy is an accrued benefit. GCM 39869 (April 6, 1992).

Additionally, also of assistance in this inquiry is a 1985 IRS revenue ruling with respect to the effect that termination of a plan that contained a retirement-type subsidy had on a plan's ability to satisfy § 411(d)(6). This revenue ruling, Revenue Ruling 85–6, explained: "[i]n the proposed termination of a qualified defined benefit plan, the plan will not satisfy section 411(d)(6), as amended by the Retirement Equity Act of 1984, unless an early retirement subsidy [based upon meeting specified years of service plus a certain age] is provided for participants who satisfy the pretermination subsidy requirements after the termination of the Plan" and "[t]he right of a participant under the plan to immediate payment without actuarial reduction, if [certain age and years of service conditions are met], is . . . a retirement-type subsidy subject to section 411(d)(6)(B) of the code . . . . A participant could, after

the date of the proposed termination, satisfy the pretermination conditions necessary to receive this retirement-type subsidy." IRS Rev. Rule 85–6, 1985–1 C.B. 133. Notably, with respect to IRS revenue rulings in general and Revenue Ruling 85–6 in particular, the Third Circuit court has stated: "[w]e give weight to IRS revenue rulings and do not disregard them unless they 'conflict with the statute they purport to interpret or its legislative history, or if they are otherwise unreasonable.' Revenue Ruling 85–6 is reasonable and entirely consistent with Section 204(g) of ERISA and Section 411(d)(6) of the IRC. It is also consistent with the legislative history of the REA." *Gillis*, 4 F.3d at 1145.

Finally, as the parties' briefs amply illustrate, there is also case law to support the Plaintiff's and the Defendants' positions on this issue.

After careful consideration of the submissions of the parties in light of the terms of the pre–1994 and 1994 versions of the Plan and the many, varied legal authority concerning this issue, I find as follows.

■ First, I find that because Subsection 20.B.2 (a) of the pre–1994 version of the Plan provided that the monthly amount of the PJS benefit included "any amounts computed pursuant to Section 4 of the Plan [the normal retirement pension provision of the Plan]" without any actuarial reduction, even though the participant was retiring at an age which would not normally entitle him or her to the normal retirement pension provided under the terms of the Plan without any actuarial reduction and further states in Subsection 20.B.3 that "[t]he amount calculated in accordance with Subsection 20.B.2(a) shall be payable for the lifetime of the Employee," that, at the very least, the amount of the PJS benefit "computed pursuant to Section 4 of the Plan" (if not the entire PJS benefit) is: (1) a benefit pursuant to which "more is provided . . . than any reasonable actuarial equivalent of the plan's normal retirement benefit" and (2) "a subsidy that continues after retirement." Therefore,

the PJS benefit is "a retirement-type subsidy" as that term is used in §§ 204(g) and 411(d)(6). *See Dade,* 68 F.3d at 1562, n. 1; S.Rep. No. 575, 98th Cong., 2d Sess. 30, reprinted in 1984 U.S.Code Cong. & Admin. News 2547, 2576.

In so holding, I obviously disagree with the Defendants' position that the PJS benefit is not a protected retirement-type subsidy because the Plan provides that "once the employee reached age 65 [the normal retirement age under the Plan], this pre-retirement subsidy ceased, and he or she received only the Plan's 'normal retirement' benefit. It is a key fact that, when the employee reached age 65, he or she was entitled to nothing more than their normal retirement benefit." Defendants' Supporting Brief, p. 6. The difficulty I have with the Defendants' argument is that "Subsection 20.B.3 expressly provides that '[t]he amount calculated in accordance with Subsection 20.B.2(a) shall be payable *for the lifetime of the Employee,'*" not until the participant turned 65.

■ I further find that the Defendants' argument that an unpredictable contingent event benefit such as the PJS benefit, is not protected until the contingent event occurs, is without merit in that it (and the authority it relied on) reads into the relevant statute a limitation on the protection of retirement-type benefits that simply is not supported by either the statutory language or the legislative history of § 204(g). More specifically, first, no where in plain language of § 204(g) is there any distinction made between "contingent" and "non-contingent" retirement-type subsidy benefits. Second, the legislative history of the amendment to § 204(g) expressly states that the amendment was designed to "protect[ ] the accrual of benefits with respect to participants who have met the requirements for a benefit as of the time a plan is amended *and participants who subsequently meet the preamendment requirements." See* S.Rep. Non 575, 98th Cong., 2d Sess. 28, reprinted in 1984 U.S.Code Cong. & Admin. News 2547, 2574 (emphasis added). Additionally, such a conclusion

seemingly would be in direct opposition to the Third Circuit court's view of § 204(g) in *Dade, supra.,* wherein after noting that the early retirement benefit at issue was a retirement-type subsidy, the court explained, without any limitations, that after the amendment to § 204(g) in 1984, while "a plan sponsor could prospectively eliminate an early retirement benefit by amendment ... the amendment could not adversely affect the early retirement benefit of a plan participant who satisfied the pre-amendment conditions for the benefit either before or after the amendment" and "[t]hus, if [the plan sponsor] had adopted such an amendment, it would have had to allow those employees who remained in its employ after the amendment to 'grow into' the benefit." *Dade,* 68 F.3d at 1562.

In so holding, I also acknowledge that my finding that the PJS benefit is a retirement-type subsidy subject to the protection of § 204(g) is not consistent with (and indeed is contrary to) the above-discussed IRS General Counsel Memorandum, GCM 39869 (April 6, 1992). In reaching the decision that I did, I gave the IRS' analysis of § 411(d)(6) in GCM 39869 much consideration. For the above-stated reasons, however, I simply disagree with the IRS' analysis of the issue.

Moreover, I also disagree with the Defendants' contention that the Third Circuit court's decision in *Berger v. Edgewater Steel Co.,* 911 F.2d 911 (3d Cir.1990), stands for the proposition "that contingent benefits may be eliminated before the contingency occurs." Defendants' Brief, p. 18. Specifically, at issue in *Berger, inter alia,* was a benefit that stated that if a Plan participant had met certain age and service requirements and the participant "consider[ed] that it would be in his interest to retire, and the Company consider[ed] that such retirement would likewise be in its interest and it approve[d] an application for retirement under mutually satisfactory conditions, then the participant would be eligible to retire and upon his retirement would be eligible for a spe-

cial payment and a regular pension." *Id.* at 914 n. 2. Three of the *Berger* plaintiffs had announced their intent to retire and had requested the 70/80 retirement benefit and been denied. The plaintiffs argued that said blanket denial constituted an amendment to the Plan that violated § 204(g). The *Berger* court first quoted the section of § 204(g) that provides that "a plan amendment which has the effect of—(A) eliminating or reducing an early retirement benefit ... with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits." *Id.* The court then quoted the legislative history of the statutory provision that explains:

> [this amendment to § 204(g)] generally protects the accrual of benefits with respect to participants who have met the requirements for a benefit as of the time a plan is amended and participants who subsequently meet the preamendment requirements. The bill does not, however, prevent the reduction of a subsidy in the case of a participant who, at the time of separation from service (whether before or after the plan amendment) has not met the preamendment requirements.

*Id.* Ultimately, the *Berger* court reasoned:

> [t]his provision of § 204(g) does not apply to this case because none of the [plaintiffs] met the requirements for 70/80 retirement at the time that [defendant company] amended the Plan. This included the requirement that their early retirement be in the mutual interest of both them and the company. Although [defendant company's] blanket denial of requests for ${}^{70}\!/\!_{80}$ retirement

could be seen as an amendment to the Plan, the instant provision still would not apply because none of the [plaintiffs] met the requirements for ${}^{70}\!/\!_{80}$ retirement prior to the time the blanket denial policy was instituted.

*Id.* As I read the *Berger* decision, at no point does the analysis even infer that "contingent benefits may be eliminated before the contingency arose."

Finally, I also acknowledge the Defendants' argument that I should rely upon a favorable determination by the Internal Revenue Service, the agency responsible for interpreting the Internal Revenue Code, that the Plan as amended in 1994 did not violate 26 U.S.C. § 411(d)(6), the Internal Revenue Code's counter-part statute to § 204(g) and satisfied the requirements for a tax-qualified pension plan, because prior to issuing the favorable determination letter, the IRS had preliminarily asked Defendants "why the elimination of the PJS provision is not a protected benefit," and Defendants had explained to the IRS "that under IRS GCM 39869 and *Ross v. Pension Plan for Hourly Employees of SKF Industries, Inc.,* 847 F.2d 329 (6th Cir.1988), the PJS benefit is an 'unpredictable contingent event' benefit and not protected.[6]" Defendants' Reply Brief, p. 20. One difficulty I have with this argument is that the conclusion reached by the IRS is unsupported by any analysis of why the Plan, to the extent it amended the definition of a "Permanent Job Separation," did not violate § 411(d)(6). *See Hickey v. Chicago Truck Drivers, Helpers and Warehouse Workers Union,* 980 F.2d 465, 469 (7th Cir.1992) (holding with re-

---

**6.** More specifically, Defendants responded as follows:

> *Elimination of Special Retirement Provision.* The prospective elimination of the special retirement provision is permitted because such benefits are classified as "unpredictable contingent event" benefits and, as such, do not become "protected" until the contingent event occurs. In other words, a plan may be amended to eliminate such a benefit with respect to those employees for

whom the contingent event—such as a plant shutdown—has not occurred. Please see IRS GCM 39869 (Oct. 2, 1991), which reviews legislative history in reaching this conclusion. We also note that at least one court has concluded that plant shutdown benefits are not "retirement-type subsidies," and for that reason also are not subject to protection. *See Ross v. Pension Plan for Hourly Employees of SKF Industries, Inc.,* 847 F.2d 329 (6th Cir.1988).

February 12, 1995 letter, p. 8.

spect to an IRS determination letter that approved defendants' application for continued qualification of plan under 26 U.S.C. § 401 where the plan contained an amendment that eliminated a COLA provision, that "[g]iven the informal nature of the[ ] letter[ ], the express limitations included in the IRS letter, and the absence of any reasoning to explain the basis for the statements, we do not think that any implication in . . . the[ ] letter[ ] that elimination of the COLA was lawful is entitled to deference."); *Rybarczyk v. TRW, Inc.,* 1997 WL 129296, * 8 (N.D.Ohio March 14, 1997) (holding that where IRS determination letter concluded that plan was qualified but gave no indication that the IRS considered the specific issue involved in the litigation and to the extent that it did, gave no indication of the reasoning behind the determination, court did not find IRS determination letter to be persuasive authority); *In re Gulf Pension Litig.,* 764 F.Supp. 1149, 1172 (S.D.Tex.1991), *aff'd,* 36 F.3d 1308 (5th Cir.1994), *cert. den'd,* 514 U.S. 1066, 115 S.Ct. 1699, 131 L.Ed.2d 561 (1995) (holding that where IRS determination letter evidenced no investigation or legal analysis of the facts by IRS, the determination letter was due no deference). Moreover, to the extent the IRS relied on the analysis set forth in IRS GCM 39869 as the basis for its determination, I have already held that I disagree with the IRS' interpretation.

Accordingly, because it is not factually disputed that Defendants amended the definition of "Permanent Job Separation" with the effect that said amendment reduced the PJS benefit and that Plaintiff subsequently satisfied all of the pre-amendment conditions for this retirement-type subsidy (age, years of service and termination of the employment with CBS through no fault of his own through lack of work for reasons associated with CBS' business for whom CBS determines there is no reasonable expectation of recall), al-

beit after the Plan had been amended, I find as a matter of law that when the Defendants amended the definition of Permanent Job Separation they, by plan amendment, decreased an accrued benefit of Plaintiff in violation . of ERISA § 204(g).[7] *See also, for example, Harms v. Cavenham Forest Industries, Inc.,* 984 F.2d 686 (5th Cir.1993) (holding where benefit's eligibility terms involved there being an "involuntary separation" requirement for receiving the benefit as well as the participant having to satisfy certain age and period of service requirements and participants eventually met all of the conditions for receiving the benefit but did not satisfy the "involuntary separation" condition until after the plan had been amended to eliminate the benefit, that the benefit constituted a retirement-type subsidy. Therefore, because the participants met all of the conditions for the benefit, even though the requirement of "involuntary separation" did not occur until after the amendment of the Plan, the benefits were "vested pension benefits that had accrued and could not be reduced or eliminated by subsequent plan amendment").

Accordingly, the Plaintiff's Motion for Partial Summary Judgment on the issue of whether Defendants violated 29 U.S.C. § 1054(g) is granted.

---

7. Because I found that the PJS benefit is a retirement-type subsidy as that term is used in §§ 204(g) and 411(d)(6), it was not necessary to address Plaintiff's alternate contention that

the benefit is "an early retirement benefit" protected under ERISA § 204(g) and therefore, I elect not to address said argument on the merits.