Harry BELLAS,

v.

**CBS, INC.; Westinghouse Pension Plan, Appellants.**

No. 99–3775.

United States Court of Appeals, Third Circuit.

Argued June 15, 2000.

Filed Aug. 14, 2000.

518

Henry W. Ewalt, George M. Medved, David J. Kolesar, Pepper Hamilton LLP, Pittsburgh, PA, Brian T. Ortelere, Pepper Hamilton LLP, Philadelphia, PA, Andrew M. Kramer, Glen D. Nager (argued), Gregory G. Katsas, Charles V. Stewart, Todd C. Amidon, Jones, Day, Reavis & Pogue, Washington, DC, Dennis Derr, CBS Corporation, Pittsburgh, PA, Attorneys for Appellants.

Theodore Goldberg, David B. Rodes (argued), John T. Tierney, III, Goldberg, Persky, Jennings & White, William T. Payne, Schwartz, Steinsapir, Dohrman & Sommers, Pittsburgh, PA, Attorneys for Appellee.

Trevor W. Swett, Kent A. Mason, Albert G. Lauber, Michael T. Doran, Jason .K. Bortz, Caplin & Drysdale, Washington, DC, Attorneys for Amicus Curiae Association of Private Pension and Welfare Plans.

BEFORE: GREENBERG and McKEE, Circuit Judges, and SHADUR,* District Judge.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

### I.  INTRODUCTION

This matter has been certified for interlocutory appeal to address a question of first impression in this court, *i.e.*, whether a permanent job separation benefit contained within a pension plan constitutes an early retirement benefit or retirement-type subsidy protected by the anti-cutback provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, as amended by the Retirement Equity Act of 1984 ("REA") and the Omnibus Reconciliation Act of 1987.  The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA section 502(e), 29 U.S.C. § 1132(e).

---

* Honorable Milton I. Shadur, Senior Judge of the United States District Court for the Northern District of Illinois, sitting by designation.

On June 29, 1999, the district court granted plaintiff-appellee Harry Bellas's motion for partial summary judgment, *see Bellas v. CBS, Inc.,* 73 F.Supp.2d 500 (W.D.Pa.1999), and denied defendants-appellants CBS, Inc.'s and Westinghouse Pension Plan's motion to dismiss the complaint. *See Bellas v. CBS, Inc.,* 73 F.Supp.2d 493 (W.D.Pa.1999). On July 13, 1999, appellants filed a motion to certify the order granting Bellas's motion for partial summary judgment for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) which the district court granted on July 29, 1999. Subsequently, the appellants filed a petition for permission to appeal under section 1292(b), which we granted on September 10, 1999.

### a. Parties and Factual Background

Bellas, a former employee of CBS and Westinghouse Electric Corporation, on August 31, 1998, filed this action on behalf of himself and all others similarly situated against CBS and the Westinghouse Pension Plan, alleging that the Westinghouse Plan was amended impermissibly by first the narrowing, and then the elimination entirely, of a "Special Retirement Provision" in the plan that was applicable to senior employees terminated as a result of a "Permanent Job Separation." *See* J.A. at 269. Because CBS is the plan sponsor and administrator and is a successor to Westinghouse, CBS and Westinghouse may be considered one entity for purposes of this appeal and thus we will refer to the corporate defendant as CBS even though Westinghouse previously employed Bellas. Bellas contends that these amendments had the effect of eliminating or reducing an early retirement benefit or retirement-type subsidy in contravention of the REA amendments to ERISA codified at section 204(g), 29 U.S.C. § 1054(g). Bellas further claims that in adopting and implementing these amendments, CBS violated its fiduciary duties of acting solely in the interest of plan participants and beneficiaries in administering the plan in accordance with both the governing documents and instruments and ERISA, and of exercising care, prudence, and diligence in the performance of its responsibilities and thereby violated ERISA.

Section 20 of the pre–1994 version of the Westinghouse Plan provided a "Special Retirement Provision" for employees meeting stated age and service requirements who were terminated as a result of a "Permanent Job Separation" (the "PJS Benefit"). In particular, Section 20 of the pre 1994 version of the plan provided in relevant part:

B. 1. An Employee whose employment is terminate d as a result of a Permanent Job Separation, who at the time of such Permanent Job Separation does not satisfy any of the requirements for retirement pursuant to Section 2 of the Plan, may retire on his Special Retirement Date or on the first day of any month following his Special Retirement Date if, by the end of the calendar year in which he is separated, he would have satisfied one of the age-and-service combinations set forth below had he remained continuously employed to the end of such year:

— Age 50 or over with twenty-five (25) or more years of Eligibility Service,

— Age 51 or over with twenty-two (22) or more years of Eligibility Service,

— Age 52 or over with nineteen (19) or more years of Eligibility Service,

— Age 53 or over with sixteen (16) or more year s of Eligibility Service,

— Age 54 or over with thirteen (13) or more years of Eligibility Service,

— Age 55 or over with ten (10) or more years of Eligibility Service.

2. The amount of monthly pension payable to an Employee who satisfies the requirements set forth in Subsection 20.B.1 above shall be the sum of (a), (b) and (c) below:

(a) Any amounts computed pursuant to Section 4 of the Plan [Section 4 is entitled "Normal Retirement Pension"].

(b) Ten ($10.00) dollars multiplied by his Credited Service.

(c) If the Employee had twenty-five (25) years o f eligibility Service and his Special Retirement Date is on or before September 1, 1994, an additional $100. The amounts calculated in accordance with Subsection 20.B.2 above shall be based on the provisions of the Plan in effect on the Employee's Special Retirement Date.

3. The amount calculated in accordance with Subsection 20.B.2 (a) shall be payable for the lifetime of the Employee and shall be subject to all of the optional forms of payments described in Section 10.

4. The amounts calculated in accordance with Subsections 20.B.2 (b) and 20.B.2 (c) shall be payable up to and including the month in which the Employee attains his 62nd birthday. These amounts shall not be subject to any of the optional forms of payment described in Section 10, except the Lump Sum form described in Subsection 10.C.5.

J.A. at 74–75.

The pre–1994 version of the Westinghouse Plan, in pertinent part, defined the term "Permanent Job Separation" as meaning "the termination of the employment of an Employee ... through no fault of his own through lack of work for reasons associated with the business for whom [the employer] determines there is no reasonable expectation of recall." *Id.* at Section 1, J.A. at 38. Further, the Pre 1994 Summary Plan Description explains with respect to this provision:

[t]he amount of your special retirement pension is the full amount you have earned to the date you are permanently separated. There are no reductions applied to your pension, even though you

are retiring early. If you are under age 62, you receive a monthly early retirement supplement of $10 for each year of credited service. This supplement stops when you turn age 62.

If you have at least 25 years of eligibility service, you receive an additional $100 per month until you turn age 62. This additional $100 per month is available only if your special retirement pension begins on or before September 1, 1994.

J.A. at 110.

The pre–1994 version of the Plan also contained a "Normal Retirement Pension" provision and an "Early Retirement Pension" provision. *See* pre–1994 version of the Westinghouse Plan, Sections 4–5, J.A. at 42–48.

On January 1, 1994, the Westinghouse Plan was amended to alter participants' entitlement to the PJS Benefit in two respects: (1) the amendments made it harder to qualify for the PJS Benefit after January 1, 1997, by narrowing the definition of "Permanent Job Separation" to apply only if an employee's employment termination was due to a job movement, product line relocation, or location close-down and (2) the amendments eliminated the PJS Benefit in toto for terminations on or after September 1, 1998.[1] More specifically, the definition of the term "Permanent Job Separation" was redefined in the 1994 version of the plan, in relevant part, to read as follows:

Permanent Job Separation means, for periods prior to January 1, 1997, the termination of the employment of an Employee with an Employer ... through no fault of his own for lack of

---

1. With respect to the total elimination of the Special Retirement Pension after September 1, 1998, appellants, without providing any supporting documentation, explained in their opposition to Bellas's motion for summary judgment that "[t]he Plan was amended in 1998 to extend the 1994 PJS [Permanent Job Separation] benefit because of job movement or product-line relocation, or location close-down until the year 2000." *See Bellas*, 73 F.Supp.2d at 502–03 n. 2 (citing Defendants'

Opposition to Plaintiff's Motion for Summary Judgment, p. 6 n.7). For purposes of its decision, the district court concluded it was immaterial whether or not the amendments totally eliminated the Special Retirement Pension after September 1, 1998, because appellants did not dispute that by amending the Westinghouse Plan to narrow the definition of "Permanent Job Separation," a participant's ability to receive a PJS Benefit under the Westinghouse Plan was reduced.

work for reasons associated with the business for whom such Employer ... determines, on a uniform and nondiscriminatory basis, that there is no reasonable expectation of recall.

.    .    .    .    .

For periods on or after January 1, 1997 and before September 1, 1998, a Permanent Job Separation means solely the termination of the employment of an Employee with an Employer ... because of job movement or product-line relocation, or location closedown, as those terms are defined below.... Layoffs due to adjustments in the workforce caused by changes in production requirements, manufacturing processes, sales volume, inventory levels, make or buy decisions, decisions to discontinue a product line, or any other reasons associated with the business shall not be a job movement or product-line relocation.... In no event shall a Permanent Job Separation occur after August 31, 1998.

1994 Version of the Westinghouse Plan, J.A. at 131–32.

CBS employed Bellas in its nuclear division from 1964 until December 31, 1997, during which employment he was a participant in the Westinghouse Plan at all relevant times before December 31, 1997, including the time of the adoption of the 1994 amendments. Bellas was notified of the amendments either in late 1994 or upon the distribution of the January 1, 1995 Summary Plan Description of the Westinghouse Plan.

CBS terminated Bellas's employment on December 31, 1997, through no fault of his own, for lack of work for reasons associated with CBS's business and with no reasonable expectation of recall. At the time of his termination, Bellas was over 50 years of age and had 30 years of service with CBS. Under the pre–1994 version of the Westinghouse Plan, upon his termination Bellas would have satisfied all of the conditions necessary to receive the PJS Benefit (*i.e.* age, years of service, and reason for termination).

### b. *Procedural History*

Bellas filed this class action on August 31, 1998, against CBS and the Westinghouse Pension Plan. Count one of the complaint alleged that the 1994 amendments to the Westinghouse Plan, which amended eligibility conditions for receipt of PJS Benefits, violated section 204(g) of ERISA. *See* J.A. at 275. Count two of the complaint alleged that, in adopting and implementing those amendments, CBS violated fiduciary duties imposed under ERISA. *See id.* at 275–76. While appellants deny that they violated ERISA, they do not dispute that the amendments greatly reduced Bellas's benefits.

Appellants moved to dismiss the complaint, and Bellas moved for partial summary judgment on the question of whether the 1994 plan amendments violated section 204(g). As we have indicated, on June 29, 1999, the district court denied appellants' motion to dismiss, *see Bellas v. CBS, Inc.,* 73 F.Supp.2d 493, and granted Bellas's motion for partial summary judgment. *See Bellas v. CBS, Inc.,* 73 F.Supp.2d 500.

In reaching its decision that the plan amendments violated ERISA section 204(g), the district court adopted reasoning directly contrary to the Internal Revenue Service's interpretation of IRC § 411(d)(6), the IRC's counterpart to section 204(g), as set forth in its General Counsel's Memorandum ("GCM") 39869 dated April 6, 1992, a memorandum that we consider later as a central matter on this appeal. Recognizing the direct conflict between its ruling and the IRS interpretation, the district court granted appellants' motion to certify the partial summary judgment order for an interlocutory appeal. *See* J.A. at 316–17. As we have indicated, we granted appellants' subsequent petition for permission to appeal. *See id.* at 1.

The district court set forth the controlling question of law in its order granting appellants' motion to certify the partial summary judgment order for interlocutory appeal, as:

Whether the Permanent Job Separation benefit contained in the pre 1994 version of the Westinghouse Pension Plan is a retirement-type subsidy protected by section 204(g) of ERISA, 29 U.S.C. § 1054(g).

J.A. at 316.

## II. DISCUSSION

We exercise plenary review with respect to the district court's order on the motion for partial summary judgment. *See Seibert v. Nusbaum, Stein, Goldstein, Bronstein & Compeau,* 167 F.3d 166, 170 (3d Cir.1999); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224, 1230 (3d Cir.1993). We will affirm only if we conclude that the pleadings, depositions, answer to interrogatories and admissions on file, together with the affidavits, show that the party who obtained summary judgment on a point was entitled to that judgment as a matter of law and that there was no genuine dispute of material fact standing in his or her way. *See* Fed.R.Civ.P. 56(c). Here, however, it is clear that we are not concerned with disputed questions of fact and thus our determination is essentially legal in nature.

■■■ We start our discussion of the issues by recognizing that ERISA neither mandates the creation of pension plans nor in general dictates the benefits a plan must afford once created. *See Smith v. Contini,* 205 F.3d 597, 602 (3d Cir.2000); *Dade v. North Am. Philips Corp.,* 68 F.3d 1558, 1561 (3d Cir.1995) (citing *Hlinka v. Bethlehem Steel Corp.,* 863 F.2d 279, 283 (3d Cir.1988); H.R.Rep. No. 807, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 4639, 4670, 4677). Only the plan itself can create an entitlement to benefits. Consequently, "[this court is] required to enforce the Plan as written unless [it] can find a provision of ERISA that contains a contrary directive." *Dade,* 68 F.3d at 1562.

■ The protection of retirement benefits reflects the underlying policy goals of ERISA. Congress's chief purpose in enacting the statute was to ensure that workers receive promised pension benefits upon retirement. *See Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 375, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980); *see also Smith,* 205 F.3d at 604. In constructing ERISA, Congress perceived the statute's accrual and vesting provisions as the heart of that protection. *See Hoover v. Cumberland, Maryland Area Teamsters Pension Fund,* 756 F.2d 977, 985 (3d Cir.1985). Accordingly, it recognized that

'Unless an employee's rights to his accrued pension benefits are nonforfeitable, he has no assurance that he will ultimately receive a pension. Thus, pension rights which have slowly been stockpiled over many years may suddenly be lost if the employee leaves or loses his job prior to retirement. Quite apart from the resulting hardships, ... such losses of pension rights are inequitable, since the pension contributions previously made on behalf of the employee may have been made in lieu of additional compensation or some other benefit which he would have received.'

*Smith,* 205 F.3d at 604 (quoting S.Rep. No. 383, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 4890, 4930). Therefore, in *Hoover,* we concluded that a plan amendment that retroactively reduced benefits promised to plaintiffs for almost seven years was precisely the sort of inequity Congress designed ERISA to prevent. *See* 756 F.2d at 985–86.

As we have indicated, this appeal presents the question of whether the PJS Benefits provided for in the Westinghouse Plan constitute accrued benefits protected by the anti-cutback provisions of ERISA section 204(g). Section 204(g) prohibits an employer from decreasing or eliminating a participant's accrued benefits by plan amendment. *See* 29 U.S.C. § 1054(g). Before 1984, ERISA did not protect early retirement benefits or retirement-type subsidies because they were not considered to be accrued benefits. *See Bencivenga v. Western Pa. Teamsters and Em-*

*ployers Pension Fund,* 763 F.2d 574, 577 (3d Cir.1985).[2]

While the definition of an accrued benefit has not been modified, Congress did modify section 204(g) in 1984 to the end that early retirement benefits and retirement-type subsidies were defined as being accrued for purposes of ERISA's anti-cutback provisions. *See* Retirement Equity Act ("REA"), Pub.L. No. 98–397. Thus, ERISA section 204(g), as amended, provides:

(g) Decrease of accrued benefits through amendment of plan

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) or 1441 of this title.

(2) For purposes of paragraph (1), a plan amendment which has the effect of—

(A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or

(B) eliminating an optional form of benefit,

with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy. The Secretary of the Treasury may by regulations provide that this subparagraph shall not apply to a plan amendment described in subparagraph (B) (other than a plan amendment having an effect described in subparagraph (A)).

(3) For purposes of this subsection, any—

(A) tax credit employee stock ownership plan (as defined in section 409(a) of Title 26), or

(B) employee stock ownership plan (as defined in section 4975(e)(7) of Title 26),

shall not be treated as failing to meet the requirements of this subsection merely because it modifies distribution options in a nondiscriminatory manner.

29 U.S.C. § 1054(g).[3]

**2.** ERISA defines an accrued benefit as "in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and ... expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A). ERISA defined normal retirement age as the earlier of the normal retirement age under the plan or the age of 65. *See id.* § 1002(24). Because an early retirement provided a benefit commencing before normal retirement age, such a benefit was found not to fall within the definition of an "accrued benefit." *See Bencivenga,* 763 F.2d at 577.

**3.** IRC § 411(d)(6) which parallels section 204(g) is relevant to our discussion. Section 411(d)(6) provides:

Accrued benefit not to be decreased by amendment.—
(A) In general.—A plan shall be treated as not satisfying the requirements of this section if the accrued benefit of a participant is decreased by an amendment of the plan, other than an amendment described in section 412(c)(8), or section 4281 of the Em-

ployee Retirement Income Security Act of 1974.
(B) Treatment of certain plan amendments.-For purposes of subparagraph (A), a plan amendment which has the effect of—
(i) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
(ii) eliminating an optional form of benefit, with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy. The Secretary may by regulations provide that this subparagraph shall not apply to a plan amendment described in clause (ii) (other than a plan amendment having an effect described in clause (i)).
IRC § 411(d)(6). "Regulations prescribed by the Secretary of the Treasury under section[ ] ... 411 ... of Title 26 ... shall also apply to the minimum participation, vesting, and funding standards set forth in [ERISA]." 29

After 1984, a plan sponsor could eliminate prospectively an early retirement benefit by amendment, but under section 204(g) the amendment could not adversely affect that portion of an early retirement benefit that already had accrued to a plan participant who satisfied the pre-amendment conditions for the benefit either before or after the amendment. *See* 29 U.S.C. § 1054(g); *Dade,* 68 F.3d at 1562. Thus, if the 1994 Westinghouse Plan amendments reduced or eliminated early retirement benefits or retirement-type subsidies, the amendments would have had to allow employees who remained employed by CBS after the amendments to "grow into" the benefit. *See id.* at 1562.

Of course, we are required to enforce the Westinghouse Plan as written unless we can find a provision of ERISA that contains a contrary directive. *See Dade,* 68 F.3d at 1562. The question then is whether section 204(g) is such a directive and this in turn depends on the contingent nature of the PJS Benefits.

■ There is no question but that a standard early retirement benefit, provided exclusively upon the satisfaction of certain age and/or service requirements, is an accrued benefit that is protected by section 204(g). *See, e.g., Gillis v. Hoechst Cela-*

nese Corp., 4 F.3d 1137, 1143–44 (3d Cir. 1993); *see also Ahng v. Allsteel, Inc.,* 96 F.3d 1033, 1034 (7th Cir.1996); *Richardson v. Pension Plan of Bethlehem Steel,* 67 F.3d 1462, 1467–68 (9th Cir.1995); *Costantino v. TRW Inc.,* 13 F.3d 969, 977 (6th Cir.1994); *Hunger v. AB,* 12 F.3d 118, 120 (8th Cir.1993); *Harms v. Cavenham Forest Indus., Inc.,* 984 F.2d 686, 692 (5th Cir.1993); *Aldridge v. Lily–Tulip, Inc., Salary Retirement Plan Benefits Comm.,* 953 F.2d 587, 590 (11th Cir.1992). Despite the agreement that surrounds this general principle, the extension of section 204(g)'s coverage to benefits whose payment is contingent upon the occurrence of an unpredictable event,[4] as are the PJS Benefits at issue on this appeal as their availability was triggered by employment termination, has led to a split of authority.

**a.** *Defining the Terms Early Retirement Benefit and Retirement Type Subsidy*

ERISA does not specifically set forth the definition of early retirement benefit or retirement-type subsidy. Rather, Congress contemplated that the Treasury Department would promulgate regulations setting forth the definition of retirement-type subsidy. *See* 29 U.S.C. § 1054(g)(2)(A). To date, the Treasury has not promulgated or proposed any such regulations.[5] Nevertheless, on a general

U.S.C. § 1202(c). Accordingly, the interpretation of section 411(d)(6) is relevant to the instant appeal; section 204(g) and section 411(d)(6) are meant to be interpreted consistently. *See id.*

4. In this case, the Pre–1994 Westinghouse Plan provided benefits contingent upon certain involuntary job losses. The courts, and the appellants and the amicus, refer to this form of benefit as a plant shutdown benefit even though the actual benefit provided may be triggered by events other than a plant shutdown. Because there is no relevant distinction between terming the benefit a plant shutdown benefit or a job loss benefit, we adopt the use of the term "plant shutdown" to facilitate discussion, though we recognize that Bellas himself was not terminated as a result of a plant shutdown, as that term may be commonly understood. Notwithstanding the concerns raised in the concurring opinion, we find that the resolution of the questions presented here turns not upon the nature of the

contingent event that triggered payment of the benefit, but on whether the benefit continues beyond normal retirement age and therefore qualifies as an early retirement benefit or retirement-type subsidy. The nature of the event that caused the employee's termination does not control this inquiry

5. While regulations have not been promulgated that define what is an accrued benefit protected by the anti-cutback provision, the Treasury Department has issued a regulation in which it sets forth certain benefits that are not accrued benefits for purposes of IRC § 411(d)(6). The list of benefits that are not accrued benefits includes: (1) ancillary life insurance protection, (2) accident or health insurance, (3) certain social security supplements, (4) the availability of loans, (5) the right to take after-tax employee contributions or elective deferrals, (6) the right to direct investments, (7) the right to a particular form of investment, (8) the allocation of dates for

level, the definitions of early retirement and retirement-type subsidy appear to be the subject of some agreement.

ERISA provides that normal retirement age usually is 65. *See* 29 U.S.C. § 1002(24). The Westinghouse Plan also considers the age of 65 to be the normal retirement age. *See* Westinghouse Plan § 2.A, J.A. at 40. "[A]llowance ... for retirement at an earlier age legally creates an 'early' retirement benefit. The fact that the plan does not expressly use the word 'early' is not consequential." *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 281 (3d Cir.1988).

We have defined a retirement-type subsidy to be the excess in value of a benefit over the actuarial equivalent of the normal retirement benefit. *See Ashenbaugh v. Crucible Inc., 1975 Salaried Retirement Plan*, 854 F.2d 1516, 1521 n. 6 (3d Cir. 1988); *see also Dade*, 68 F.3d at 1562 n. 1. We explain this concept immediately below.

Pension plans frequently provide for early retirement benefits. *See* Dan M. McGill & Donald S. Grubbs, Jr., Fundamentals of Private Pensions (6th ed.1989) at 131–35, App. 2 to Amicus Br. Such early retirements often commence at age 55 and possibly require the fulfilment of a minimum period of service. *See id.* The value of the early retirement benefit is calculated by first determining the amount that would be payable to the participant at normal retirement age, given the participant's service and compensation as of the date of *early* retirement. *See id.* This value then is reduced by a factor reflecting that benefit payments will begin earlier than was contemplated and, therefore, are likely to continue for a longer period of time. *See id.* This reduction of the normal retirement benefit in the case of an early retirement often is termed an actuarial reduction. *See id.* The provision of an early retirement benefit greater than the

actuarial equivalent of the normal retirement benefit is referred to as a subsidized early retirement. *See id.*; *see also Ashenbaugh*, 854 F.2d at 1521 n. 6; *Dade*, 68 F.3d at 1562 n. 1.

### b. *The Legislative History of Current Section 204(g)*

The legislative history of the REA provides some insight into the definition of the term "retirement-type subsidy" and the reach of section 204(g). In the Senate Report addressing the REA, the purpose for the amendment was set forth as follows:

### Reasons for Change

The committee believes that the protection of accrued benefits, which are essentially retirement benefits, against reduction by plan amendments is an essential safeguard for plan participants and their beneficiaries. The committee also believes that valuable rights of the participants should not be lost through the elimination of benefit options because options of equal actuarial value may not be of equal value to people whose particular circumstances are not taken into account in determining actuarial equivalence.

S.Rep. No. 98–575, 98th Cong., 2d Sess., at 27 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2573.

The scope of section 204(g) was described in the following manner:

Accordingly, the bill makes it clear that the prohibition against reduction of a benefit subsidy (the excess of the value of a benefit over the actuarial equivalent of the normal retirement benefit) applies to a participant only if the participant meets the conditions imposed by the plan on the availability of the subsidy. If the protection is afforded, an employee's accrued benefit is not to be less

contributions, forfeitures, and earnings, the time for making contributions, and the valuation dates for account balances, (9) administrative procedures for distributing benefits,

and (10) rights that derive from administrative and operational provisions. *See* 26 C.F.R. § 1.411(d)–4 (in particular subsection (d) to Answer 1).

than the protected level or the accrued benefit determined under the plan without regard to the protection, whichever is greater. For example, if a plan is amended to eliminate a subsidized early retirement benefit for employees who have completed 30 years of service, then the plan would not be required to provide the subsidy to an employee who never completes 30 years of service and it would not be required to provide benefits to such an employee before the normal retirement age. On the other hand, if the employee completes 30 years of service, then the employee's accrued benefit is not to be less than the protected level or the accrued benefit determined without regard to the protection, whichever is greater.

*Id.* at 28, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2574.

With respect to retirement-type subsidies, the Senate Report stated:

The bill provides that the term 'retirement-type subsidy' is to be defined by Treasury regulations. The committee intends that under these regulations, a subsidy that continues after retirement is generally to be considered a retirement-type subsidy. The committee expects, however, that a qualified disability benefit, a medical benefit, a social security supplement, a death benefit (including life insurance), or a plant shutdown benefit (that does not continue after retirement age) will not be considered a retirement-type subsidy. *The committee expects that Treasury regulations will prevent the recharacterization of retirement-type benefits as benefits that are not protected by the provision.*

*Id.* at 30, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2576 (emphasis added). Accordingly, Congress clearly expressed its intent that the term "retirement-type subsidy" not be defined in such a way as to exclude a benefit that is essentially a retirement-type benefit from the protections of section 204(g).

### c. Cases Finding Job Separation Benefits Are Not Accrued Benefits

We are aware of three published opinions which arguably support appellants' position that the PJS Benefits provided under the Westinghouse Plan are not subject to the anti-cutback provisions of section 204(g): *Ross v. Pension Plan for Hourly Employees of SKF Industries, Inc.*, 847 F.2d 329 (6th Cir.1988); *Roper v. Pullman Standard*, 859 F.2d 1472 (11th Cir.1988) (per curiam); and *Blank v. Bethlehem Steel Corp.*, 758 F.Supp. 697 (M.D.Fl.1990).[6]

In *Ross,* the Court of Appeals for the Sixth Circuit considered a plan that provided employees meeting certain age and service requirements with the immediate payment of pension benefits in the event of a plant shutdown. *See Ross,* 847 F.2d at 330. The *Ross* court was concerned with the determination of whether the plant shutdown benefits were an early retirement benefit, retirement-type subsidy or optional form of benefit for purposes of section 204(g). *See id.* at 333.

The court explained that:

Early retirement benefits are generally benefits that become available upon retirement at or after a specified age which is below the normal retirement age, and/or upon completion of a specified period of service. An optional form of benefit is generally one that involves the power or right of an employee to choose the way in which payments due to him under a plan will be made or applied. The ... plant shutdown benefit becomes due and payable only to a participant whose active service ceases by reason of a permanent shutdown of the plant, and who at the date of such cessation of service has at least 15 years of Benefit Service and either (a) is at least 55 years old or (b) has a combined age and years of Benefit Service equal to 80 or more.

---

**6.** Independent research has found that these three opinions cited by the appellants are the only court opinions which arguably support their appeal.

*Id.* The court concluded that a plant shutdown benefit is not one that falls within the category of either an early retirement benefit or an optional form of benefit. *See id.*

Observing that the REA also provided protection for retirement-type subsidies, the court noted:

The bill provides that the term 'retirement type subsidy' is to be defined by Treasury regulations. The committee intends that under these regulations, a subsidy that continues after retirement is generally to be considered a retirement-type subsidy. The committee expects, however, that a qualified disability benefit, a medical benefit, a social security supplement, a death benefit (including life insurance), or a plant shutdown benefit (that does not continue after retirement age) will not be considered a retirement-type subsidy. The committee expects that Treasury regulations will prevent the recharacterization of retirement-type benefits as benefits that are not protected by the provision.

*Id.* at 333–34 (citing S.Rep. No. 575 at 30, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2576). Without further discussion, the court determined the plant shutdown benefits did not fall within the category of a retirement-type subsidy as contemplated by the legislative history of the REA. *See id.* at 333.

In *Roper*, the Court of Appeals for the Eleventh Circuit considered a pension plan that provided benefits to employees whose service was interrupted by a plant shutdown, lay-off or disability. *See Roper*, 859 F.2d at 1473. The *Roper* court, however, addressed the plan within the context of ERISA section 206(a) and not section 204(g). *See id.*[7] Thus, although the court found it was not necessary to its decision to address *Ross*, it noted that *Ross* supported its conclusion that a plant shutdown benefit is not an early retirement benefit. *See id.* at 1474.[8]

The *Blank* court also addressed a benefits plan that provided benefits to participants meeting certain age and service requirements separated from their employment as a result of layoffs or disability. *See Blank*, 758 F.Supp. at 698. The court stated that " [t]he accrued benefits secured by ERISA do not encompass unfunded, contingent early retirement benefits or severance benefits." *Id.* at 700 (quoting *Sutton v. Weirton Steel Div. of Nat'l Steel Corp.*, 724 F.2d 406, 410 (4th Cir.1983)) (relying upon case decided prior or to passage of REA and not addressing the anti-cutback provisions of section 204(g)).[9] In a footnote, the court stated

---

**7.** ERISA section 206(a) provides, in relevant part, "[i]n the case of a plan which provides for the payment of an early retirement benefit, such plan shall provide that a participant who satisfied the service requirements for such early retirement benefit, but separated from the service ... before satisfying the age requirement for such early retirement benefit, is entitled upon satisfaction of such age requirement to receive a benefit not less than the benefit to which he would be entitled at the normal retirement age, actuarially reduced under regulations prescribed by the Secretary of the Treasury." 29 U.S.C. § 1056(a).

**8.** As relevant to this appeal, other than citing *Ross*, the *Roper* court did not provide any analysis of section 204(g) and the definition of early retirement benefit or retirement-type subsidy. As noted by the *Roper* court, section 206(a) only applies when a plan participant is separated from service with a nonforfeitable

right to an accrued benefit. *See Roper*, 859 F.2d at 1473–74. The primary basis for the decision of the *Roper* court was not that the plant shutdown benefits were not an early retirement benefit, but rather that the plan did not provide for a nonforfeitable benefit because it encompassed factors other than age and service. *See id.* (adopting the reasoning of the district court). Accordingly, the *Roper* decision is not precedential on this appeal.

**9.** *Blank* also cited to our opinion in *Hlinka*, 863 F.2d 279, as standing for the proposition that the plant shutdown benefits at issue in *Blank* were not an accrued benefit. While we did find that such a plan was not an accrued benefit, *see Hlinka*, at 284–85, we were not concerned with the application of amended section 204(g). *See id.* at 285 n. 10. Given that the general ERISA definition of accrued benefits is linked to benefits commencing at normal retirement age, *see* 29 U.S.C.

that its conclusions were not affected by the application of section 204(g). *See id.* at 700 n. 3.

### d. Cases Finding Job Separation Benefits Are Accrued Benefits

The reported cases found to support the proposition that job separation benefits may be treated as accrued benefits for purposes of section 204(g) are *Harms v. Cavenham Forest Industries, Inc.,* 984 F.2d 686, *Wallace v. Cavenham Forest Industries, Inc.,* 707 F.Supp. 455 (D.Ore. 1989), and *Richardson v. Pension Plan of Bethlehem Steel Corp.,* 67 F.3d 1462 (9th Cir.1995).[10] We set forth their reasoning below.

In *Wallace,* the district court addressed supplemental benefits that were provided "in lieu of Early Retirement Benefits and Vested Benefits to eligible Participants who were involuntarily separated under the Severance Program." *Wallace,* 707 F.Supp. at 459. These benefits were found to be payable for life, and thus continued beyond normal retirement age. *See id.* at 460. The court reasoned that:

> The fact that the [supplemental] benefits are offered 'in lieu of Early Retirement Benefits and Vested Benefits' does not require the court to conclude that they are not retirement-type benefits. This language only indicates that an eligible participant cannot receive both the special benefits provided ... and the Early Retirement Benefits and Vested Benefits under the Crown retirement plan. The fact that eligibility is contingent upon involuntary separation does not require the court to conclude that [the supplemental benefits do] not provide retirement-type benefits. Eligibility for [supplemental] benefits is conditioned upon age and years of service as well as involuntary separation.

*Id.* The *Wallace* court concluded that the supplemental benefits were retirement-type benefits subject to the protections of section 204(g) of ERISA. *See id.*

Addressing the same plan at issue in *Wallace,* the Court of Appeals for the Fifth Circuit in *Harms* reached the same conclusion as had *Wallace.* The *Harms* court found it significant that the supplemental benefits were payable for life and were calculated similarly to general retirement subsidies—by multiplying the participant's final average pay figure by his or her years of service. *See Harms,* 984 F.2d at 692. *Harms* further concluded that the supplemental benefits were provided not as a form of severance benefit, but rather as a retirement-type subsidy. *See id.* Accordingly, the court determined that the supplemental benefits were subject to the protections of ERISA section 204(g). *See id.*

*Richardson* provides perhaps the most thorough analysis of whether shutdown benefits are protected as retirement-type

§ 1002(24), our result was clearly appropriate. What we did not address in *Hlinka,* however, was the fact that for purposes of section 204(g) early retirement benefits and retirement-type subsidies are defined as being accrued, at least for purposes of that section. Thus, while an early retirement benefit may not be considered accrued for some purposes, it may be an accrued benefit for purposes of the anti-cutback rule of section 204(g). *Blank* did not discuss the import of this distinction.

Given that *Hlinka* did not address the application of section 204(g), its holding is not controlling in this case. Further, the analysis of *Hlinka,* which is limited to the observation that the concept of accrual is defined in relationship to normal retirement age, is rendered inapplicable in this case by the passage of the REA. *See* 29 U.S.C. § 1054(g) (defining early retirement benefits and retirement-type subsidies as accrued benefits despite fact they commence prior to normal retirement age).

10. The court of appeals vacated its decision in *Richardson* when it granted a petition for rehearing in that case. *See Richardson v. Pension Plan of Bethlehem Steel Corp.,* 112 F.3d 982 (9th Cir.1997). On rehearing, the court decided that there had not been a plan amendment and therefore did not reach the issue of whether shutdown benefits were accrued benefits protected by section 204(g). *See id.* at 987. Accordingly, while we note that the court's original opinion does not have precedential value, its subsequent opinion did not undermine the logic of its earlier ruling.

subsidies by section 204(g). *Richardson* first noted that Congress indicated that it expected the Treasury Department to promulgate regulations defining the term "retirement-type subsidy." *See Richardson*, 67 F.3d at 1468. As noted, however, the Treasury Department has yet to do so. *See id.* In that absence, *Richardson* observed that courts have held that a retirement benefit is a retirement-type subsidy if the sum of the monthly payments for the participant's life exceeds what the participant would have received as normal retirement benefits. *See id.* (citing *Ashenbaugh*, 854 F.2d at 1516 n. 6; *Costantino v. TRW, Inc.*, 13 F.3d 969, 972 (6th Cir. 1994)).

The shutdown benefits addressed in *Richardson* consisted of two parts: (1) $400 per month, paid until age 62 and (2) an additional amount, equal to the normal retirement benefit, paid until death. *See id.* The court found that these shutdown benefits constituted a retirement-type subsidy because the sum of the monthly payments for life exceeded what the plan participants would have received as normal retirement benefits. *See id.*

The *Richardson* court found that the legislative history for section 204(g) supported this conclusion. *See id.* Quoting from the Senate Report, the court noted that:

> a subsidy that continues after retirement is generally to be considered a retirement-type subsidy. The committee expects, however, that a qualified disability benefit, a medical benefit, a social security supplement, a death benefit (including life insurance), or a plant shutdown benefit (that does not continue

after retirement age ) will not be considered a retirement-type subsidy.

*Id.* (quoting S.Rep. No. 575 at 30, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2576). The court read the Senate Report to mean that shutdown benefits that *do* continue after retirement age are a retirement-type subsidy.[11] *See id.* The pension plan, however, argued that the shutdown benefits there at issue did not continue after retirement age because at age 62 the participants stop receiving the $400 per month and then received only the same amount per month as they would have received if they had retired at age 62. *See id.* According to the pension plan, then, the subsidy ended at normal retirement age. *See id.*

The court found that argument unavailing. *See id.* at 1469. The shutdown benefits that a plan participant received upon a plant shutdown were found not to be miraculously transformed into normal retirement benefits when the recipient reached age 62. *See id.* Rather, the plan participants received shutdown benefits from the time the plant closed until death. *See id.* While the amount of shutdown benefits the plan participant was entitled to receive was calculated by reference to normal retirement benefits, the court held that that circumstance did not transform the shutdown benefits into normal retirement benefits. *See id.*

The *Richardson* court found additional support for its conclusion in Treasury Department General Counsel Memorandum 39869 addressing section 411(d)(6) of the Internal Revenue Code. *See id.* The GCM defined different types of shutdown benefits as follows:

> Congress said only that a shutdown benefit "that does not continue after normal retirement" was not a retirement-type subsidy. *See id.* That statement, in conjunction with Congress's general assertion that a subsidy that continues after retirement is a retirement-type subsidy, strongly implies that shutdown benefits that do continue after retirement age are retirement-type subsidies. *See id.*

---

**11.** The *Richardson* court declined to follow *Ross,* 847 F.2d 329, where the Court of Appeals for the Sixth Circuit read the Senate Report as stating that shutdown benefits never can be included in the definition of "retirement-type subsidy." *See Richardson,* 67 F.3d at 1468 n. 4. The court believed that if Congress had wanted to indicate that shutdown benefits were not retirement-type subsidies, it would have said so. *See id.* By contrast,

Some shutdown benefits are provided in a form similar to severance benefits. They are short-term in nature and are a supplement or replacement of the participant's income during the period of unemployment. These benefits are provided for a limited period of time after the termination of the individual's employment and the amount of the benefit is generally determined either as a flat amount or as a multiple or fraction of the individual's annual compensation. . . .

Alternatively, shutdown benefits may continue beyond normal retirement age, i.e., retirement-type benefits. Generally, shutdown benefits provide an incentive to employees who are at or near normal retirement age to retire at the time of a plant shutdown. For example, the employer . . . may supplement the accrued benefit of the individual.

*Id.* (quoting GCM 39869). Accordingly, the court concluded that the shutdown benefits there at issue continued after normal retirement age, and thus were retirement-type subsidies for purposes of section 204(g). *See id.*

In *Richardson* the pension plan also argued that even if the shutdown benefits were retirement-type subsidies, plan participants were not protected by section 204(g) because their benefits did not accrue before the amendment. *See id.* That

is, the shutdown did not occur until after the pension plan eliminated the shutdown benefits. *See id.* The court rejected this argument. *See id.*

The *Richardson* court found that section 204(g) explicitly provides protection against amendment of retirement-type subsidies so long as the participant satisfies the preamendment conditions for the subsidy "either before or after the amendment." *Id.* Further, the court observed that an IRS revenue ruling concerning retirement-type subsidies under IRC § 411(d)(6) states that "[a] participant could, after the date of the proposed [amendment], satisfy the [preamendment] conditions necessary to receive this retirement-type subsidy." *Id.* (citing Rev.Rule 85–6, 1985–1 C.B. 133). Because the shutdown benefits were found to be a retirement-type subsidy, section 204(g) precluded the pension plan from eliminating them. *See id.*

### e. *IRS GCM 39869* [12]

■ IRS General Counsel Memorandum 39869, dated April 6, 1992, addressed two issues relevant to the instant appeal: (1) whether shutdown benefits may be provided in a qualified pension plan, and (2) if shutdown benefits may be provided in a qualified plan, whether they are accrued benefits protected under IRC § 411(d)(6). *See* GCM 39869, IRS Pos. (C.C.H.) P 2351

12. Appellants argue that we should defer to the IRS's interpretation of section 411(d)(6) as set forth in GCM 39869 and a favorable determination letter from the IRS stating that the plan here at issue did not violate section 411(d)(6). *See* Appellant Br. at 18–30. As we have noted, due weight is given to the IRS's interpretation of its statute, and such decisions are not disregarded unless they conflict with the statute they purport to interpret or its legislative history, or if they are otherwise unreasonable. *See Gillis*, 4 F.3d at 1145. Nevertheless, inasmuch as we find that the IRS's interpretation is in conflict with the statute and its legislative history, we do not defer to either GCM 39869 or the favorable determination letter. Our decision to accord little weight to GCM 39869 is consistent with the Supreme Court's recent statement that an agency's interpretations, which are not the

product of a formal adjudication or notice-and-comment rulemaking, are entitled only to respect, not deference, to the extent that those interpretations have the power to persuade. *See Christensen v. Harris County*, —— U.S. ——, 120 S.Ct. 1655, 1662–63, 146 L.Ed.2d 621 (2000). As noted, the IRS's departure from the express language of the statute and its legislative history renders GCM 39869 unpersuasive on the points most relevant to this appeal.

We also note that Bellas argues that under an IRS manual, General Counsel opinions "do not represent the positions of the [IRS]" and thus appellants "strive[ ] to puff [GCM 39869] into something it is not." *See Appellee Br.* at 13. Inasmuch as we depart significantly from GCM 39869, we see no reason to consider the limitations the IRS places on such a memorandum.

at 7851 (Apr. 6, 1992). The IRS found that shutdown benefits may be provided in a qualified plan, but found that they were not subject to the anti-cutback provisions of section 411(d)(6) until the occurrence of the contingent event—*i.e.*, the plant shutdown.

As to the first issue, the IRS stated that the determination of whether shutdown benefits may be provided in a qualified pension plan is not dependent solely on the event that triggers the payment of the benefit, but rather on the terms of the benefit, including the form of the benefit that is being provided. *See id.* at 7853. For example, shutdown benefits that are retirement-type benefits may be provided under a qualified pension plan. Benefits that become payable because of a plant shutdown and are in the form of annuity payments that continue after retirement age were found to be retirement-type subsidies that could be provided under a qualified pension plan. *See id.* at 7854.[13]

In addition, the IRS indicated that shutdown benefits that are ancillary benefits (i.e., social security supplements) also could be provided. *See id.* at 7854. These benefits must satisfy any necessary requirements to be considered an ancillary benefit (*e.g.*, a social security supplement must satisfy the requirements of IRC § 411(a)(9) and section 1.411(a) 7(c)(4) of the regulations). Shutdown benefits that are merely layoff or severance-type benefits, however, may not be provided in a qualified pension plan. *See id.* at 7853.

As to the second issue, the IRS found that shutdown benefits that are retirement-type benefits, and not ancillary benefits, become accrued benefits and therefore are protected benefits under section 411(d)(6) only upon the occurrence of the event that triggers the right to payment of benefits (*i.e.*, the contingent event). *See id.* at 7855. Section 411(d)(6) provides that a qualified pension plan shall not be treated as satisfying section 411, and therefore is not qualified under IRC § 401(a), if the accrued benefit of a participant is decreased or eliminated. *See* IRC § 411(d)(6).[14] Pursuant to GCM 39869, if shutdown benefits are provided as retirement-type subsidies, they are accrued benefits and therefore are protected under section 411(d)(6). *See id.* at 7855. Shutdown benefits, however, that are provided as ancillary benefits are not protected benefits under section 411(d)(6).

The IRS determined that shutdown benefits that are retirement-type benefits, and are not ancillary benefits, become an accrued benefit protected under section 411(d)(6) upon the occurrence of the event that triggers the right to the benefits. *See id.* at 7855. The IRS believed that this conclusion was consistent with the treatment of shutdown benefits as unpredictable contingent event benefits for purposes of the funding requirements under IRC § 412. *See id.* at 7855. In determining a defined benefit plan's current liability for purposes of the funding requirements under section 412, unpredictable contingent event benefits are not taken into account until the event on which the benefit is contingent occurs. *See* IRC § 412(*l*)(7)(B).

The IRS stated that the legislative history of section 412(*l*) states that shutdown benefits are unpredictable contingent event benefits, citing H.R.Rep. No. 391, 100th Cong., 1st Sess. 987 (1987), *reprinted in* 1987 U.S.C.C.A.N. at 2313–1, 2313–

---

13. The IRS indicated that the determination of whether a shutdown benefit may be provided in a qualified pension plan should focus on the form of benefit. *See id.* at 7853. Shutdown benefits may be provided by an employer for a number of reasons. For example, if the employer is concerned that the employees may need some time to find a new position, the employer may want to provide each employee with a short-term replacement of income for several months or more. Alternatively, if the employees are near retirement age, the employer may prefer to supplement their retirement benefits.

14. Plan qualification is important because of the various tax benefits afforded qualified plans which will be lost if a plan is disqualified, and because of other adverse consequences following disqualification. *See, e.g.,* IRC §§ 402(b), 404(a) & 501(a).

604; S.Rep. No. 63, 100th Cong., 1st Sess. 171–172 (1987) in this regard. *See id.* at 7855. Because shutdown benefits are considered to be unpredictable contingent event benefits under section 412(*l*), a qualified pension plan is not required to fund for shutdown benefits until the triggering event occurs.

The IRS found that treating a shutdown benefit as an accrued benefit, and therefore as a section 411(d)(6) protected benefit at the time that the triggering event occurs was consistent with the treatment of this benefit as an unpredictable contingent event benefit for purposes of the additional funding requirements under sections 412(*l*) and 412(c)(7). *See id.* at 7855. The plan's definition of the shutdown benefit generally will determine the occurrence of the contingent event. For example, a plan may provide that shutdown benefits will be offered to all affected participants upon the resolution by the board of directors to close a facility. The IRS determined that in such a case the resolution by the board would be the event that triggers the shutdown benefit. *See id.* at 7855. Other plans may provide that the actual termination of operations at a particular facility is the triggering event. The IRS stated that a plan's description of a specific event is also the triggering event for determining when the shutdown benefit becomes a section 411(d)(6) protected benefit.

### f.  *Our Conclusions*

■ After careful analysis of the arguments presented and the cited authority, we hold that unpredictable contingent event benefits that provide a benefit greater than the actuarially reduced normal retirement benefit are retirement-type subsidies, and therefore are accrued benefits under section 204(g), if the benefit continues beyond normal retirement age. Such benefits are accrued upon their creation rather than upon the occurrence of the unpredictable contingent event. Our result is consistent with both the language of section 204(g) and its legislative history. For the reasons we set forth below, we do not adopt the contrary case law we have

discussed above and contrary portions of the analysis contained in GCM 39869.

As an initial matter, the concept that all plant shutdown benefits or any similar contingent benefit, cannot be a 28 protected retirement-type subsidy runs contrary to the legislative history of section 204(g). As noted in the Senate Report, "a subsidy that continues after retirement is *generally to be considered a retirement-type subsidy.*" S.Rep. No. 575 at 30, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2576 (emphasis added). The Senate Report considered only a plant shutdown benefit that does not continue after normal retirement age not to be a retirement type subsidy. *See id.* Thus, the Senate Report clearly suggests that plant shutdown benefits that continue after normal retirement age are retirement-type subsidies—a conclusion consistent with Congress's intended general rule that subsidies continuing past normal retirement age are to be considered retirement-type subsidies.

Cases like *Roper*—and *Ross*, which relied upon *Roper*—use the Senate Report to reach the conclusion that plant shutdown benefits do not fall within the category of a retirement-type subsidy. *See, e.g., Ross,* 847 F.2d at 333–34. The *Ross* court, however, did not explain why, in the face of Congress's express intention, it chose to find that plant shutdown benefits never may be considered retirement-type subsidies. There is no discussion in *Ross* of whether the plant shutdown benefits there continued beyond normal retirement age. Accordingly, we believe that the *Ross* court's analysis of the issue does not provide a basis upon which to decide this matter.

In addition, the appellants' citation of *Blank* adds little to this case as the court there relied on pre-REA case law for the proposition that contingent early retirement benefits do not fall within ERISA's definition of accrued benefits. *See Blank,* 758 F.Supp. at 700. The *Blank* court relegated its discussion of post-REA section 204(g) to a footnote that does not address

the statutory substance of the REA amendments. *See id.* at 700 n. 3. Accordingly, *Blank* does not offer support for its conclusions with respect to ERISA as it is now written.

■ The overarching concept that emerges from the statute and the legislative history is that, in the proper circumstances, plant shutdown benefits that continue beyond normal retirement age should be treated as accrued benefits for purposes of section 204(g). As stated, the Senate Report addressing the amendment of section 204(g) suggests that shutdown benefits continuing beyond normal retirement age are retirement-type benefits. *See* S.Rep. No. 575 at 30, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2576. Even GCM 39869, upon which the appellants heavily rely, notes that "benefits that become payable because of a plant shutdown and are in the form of annuity payments that continue after retirement age are retirement-type subsidies...." Given that there does not appear to be any relevant distinction between plant shutdown benefits and a more broadly defined contingent event benefit, we hold that contingent event benefits that continue beyond normal retirement age may be either early retirement benefits or retirement-type subsidies (or both) within the meaning of ERISA section 204(g). *See, e.g., Richardson,* 67 F.3d at 1468–69; *Harms,* 984 F.2d at 692; *Wallace,* 707 F.Supp. at 460.[15]

Appellants argue that even if section 204(g) protects contingent event benefits that continue beyond normal retirement age, such benefits may not be considered accrued until after the contingent event has occurred. *See* Appellant Br. at 16–30; *see also* Amicus Br. at 12–24. In support of this proposition, appellants rely primarily upon GCM 39869. But we believe that to the extent that GCM 39869 determined that plant shutdown benefits are not accrued benefits until after the occurrence of the contingent event, it is in conflict with the express terms of IRC § 411(d)(6) and the legislative history of its ERISA counterpart, section 204(g).

On this point, the district court in this matter stated:

I further find that the Defendants' argument that an unpredictable contingent event benefit such as the PJS benefit, is not protected until the contingent event occurs, is without merit in that it (and the authority it relied on) reads into the relevant statute a limitation on the protection of retirement-type benefits that simply is not supported by either the statutory language or the legislative history of § 204(g). More specifically, first, no where in plain language of § 204(g) is there any distinction made between 'contingent' and 'non-contingent' retirement-type subsidy benefits. Second, the legislative history of the amendment to § 204(g) expressly states that the amendment was designed to 'protect[ ] the accrual of benefits with respect to participants who have met the requirements for a benefit as of the time a plan is amended and *participants who subsequently meet the preamendment*

---

15. At oral argument, appellants suggested that the contingent event benefits here at issue should not be construed as retirement benefits protected by Section 204(g). *See* Tr. at 50–52 (citing *Rombach v. Nestle USA, Inc.,* 211 F.3d 190, 192–94 (2d Cir.2000)). We note that the *Rombach* court addressed disability benefits provided in a pension plan. Such benefits were found to constitute a "welfare plan" and not a pension plan protected by section 204(g). *See id.* Accordingly, the issue presented to the *Rombach* court is distinguishable from the issue presented on this appeal. The PJS Benefits provided in the Westinghouse Plan are not a temporary benefit provided in the event of unemployment, but rather provide covered employees with the option of retiring early rather than experiencing a period of unemployment. Such a benefit is not a welfare plan, but rather falls within the definition of a pension plan. *See* 29 U.S.C. § 1002(2)(A); *see also* GCM 39869 (finding that certain plant shut down benefits were properly considered to be part of a pension plan subject to anti-cutback provisions); *cf.* S.Rep. No. 575 at 30, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2576 (stating that when plant shut down benefit does not continue beyond normal retirement age it will not be considered a retirement-type subsidy).

*requirements.'* See S.Rep. No. 575, 98th Cong., 2d Sess. 28, reprinted in 1984 U.S.Code Cong. & Admin. News 2547, 2574 (emphasis added). Additionally, such a conclusion seemingly would be in direct opposition to the Third Circuit court's view of § 204(g) in *Dade, supra.,* wherein after noting that the early retirement benefit at issue was a retirement-type subsidy, the court explained, without any limitations, that after the amendment to § 204(g) in 1984, while 'a plan sponsor could prospectively eliminate an early retirement benefit by amendment ... the amendment could not adversely affect the early retirement benefit of a plan participant who satisfied the pre-amendment conditions for the benefit either before or after the amendment' and '[t]hus, if [the plan sponsor] had adopted such an amendment, it would have had to allow those employees who remained in its employ after the amendment to "grow into" the benefit.'

*Bellas,* 73 F.Supp.2d at 509 (citing *Dade,* 68 F.3d at 1562).

The district court was correct in noting that there is nothing in the language of section 204(g), or its legislative history, to suggest that a contingent event benefit accrues only upon the occurrence of the contingency. The plain language of the statute reveals that once a benefit is found to be a retirement-type subsidy, it is considered an accrued benefit. *See* ERISA section 204(g), 29 U.S.C. § 1054(g). The concept expressed in GCM 39869, that a benefit can be considered a retirement-type subsidy and yet not accrue until the occurrence of some later event, reads additional requirements into the language of section 204(g)—requirements for which there does not appear to be any support.

As the Senate Report made clear, the committee expected that any regulations defining the term retirement-type subsidy would prevent the recharacterization of retirement-type benefits as benefits that are not protected by section 204(g). *See* S.Rep. No. 575 at 30, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2576. By grafting on the requirement that the contingency must occur before certain retirement-type benefits may be protected, the IRS in GCM 39869 has undertaken just such a recharacterization. GCM 39869 appears to concede that plant shutdown benefits that continue beyond normal retirement age may be retirement-type subsidies, yet at the same time removed such subsidies from any meaningful protection by finding that such benefits did not accrue until the contingent event occurs. The legislative history, however, calls for an inclusive definition of the term retirement-type subsidy. Accordingly, we will not impose an artificial condition, such as suggested by appellants, that would have the effect of rendering unprotected a benefit that is clearly retirement in nature.

Appellants also argue that the concept of accrual connotes a benefit that accrues over time by reference to an employee's age, years of service; and years of participation. *See* Appellant Br. at 23–24. There can be no disputing this point. Appellants proceed to argue, however, that shutdown benefits do not steadily accrue in this sense, but rather are triggered by an unpredictable event such as a qualifying termination for lack of work. This argument, however, misses its mark.

Appellants appear to have imposed the concept of eligibility on the concept for accrual. While it is true that a plan participant may not be eligible to receive a shutdown benefit until the contingent event occurs, that circumstance by no means indicates that the value of that benefit has not been increasing over time in relationship to the participant's years of service under the plan, as in the case of a normal retirement benefit. The fact that a participant may not be eligible to receive payments until reaching the age of 65 does not mean that his or her retirement benefit does not accrue until the age of 65. Rather, as is commonly accepted, and as defined in ERISA section 3(23), normal retirement benefits accrue over time prior to the date of eligibility.

The fact that contingent event benefits accrue over time is bolstered by review of the Westinghouse Plan. The value of the PJS Benefits provided under the Westinghouse Plan is linked to the value of the participant's normal retirement benefit. *See* Westinghouse Plan § 20.B.2(a), J.A. at 74. Accordingly, the value of these benefits is linked directly to a participant's years of service and participation and may be calculated at any point in time. While a participant may not be entitled to receive this value until the contingent event occurs, that does not mean that such benefits do not accrue, as that term is commonly understood.

Appellants point to principles of actuarial practice to support their construction of section 204(g). *See* Appellant Br. at 25–28. Actuaries routinely treat traditional early retirement benefits (those dependent upon age and service only) as benefits that accrue at a fixed rate over time. *See id.* at 25 (citing Actuarial Standards Board, Actuarial Standards of Practice No. 4, at 25–26 (1993)). On the other hand, because shutdown benefits are contingent upon unpredictable events, they largely have defied conventional actuarial principles. *See id.* at 25–26. As a result, under ERISA, as amended by the Omnibus Reconciliation Act of 1987, unpredictable contingent event benefits are not taken into account in determining a plan's current liability and related funding obligations until after the contingent event occurs. *See* 29 U.S.C. § 1082(d)(7)(B); IRC § 412(*l*)(7)(B). Appellants argue that construing the anti-cutback rule not to apply to shutdown benefits until the occurrence of the unpredictable contingent event—and recognizing that, until then, shutdown benefits are more in the nature of insurance than anticipated benefits—advances one of the central objectives of ERISA: ensuring adequate funding for all vested and accrued benefits. *See* Appellant Br. at 26–27 (citing 29 U.S.C. § 1001(a); *Nachman Corp.*, 446 U.S. at 374–75, 100 S.Ct. at 1732–33).

While the construction of section 204(g) proffered by appellants would lend some consistency between section 204(g) and ERISA's funding provisions, it does not appear that the statute or its legislative history requires or compels such consistency. Appellants assert that until the contingent event occurs, shutdown benefits are more akin to insurance than an anticipated benefit. *See* Br. at 26–27. Under this logic, appellants appear to suggest that the occurrence of the contingent event somehow transforms insurance into a retirement benefit. As we stated above, however, Congress discouraged this attempt at recharacterizing retirement-type benefits.

In addition, we see no compelling need for consistency in this regard as the appellants urge. The question of whether a contingent event benefit is protected from reduction or elimination does not appear to be connected with the concept of funding in either ERISA or the IRC. Accounting and actuarial guidelines represent an attempt to account for real life events in the best manner possible. Hence, unpredictable contingent event benefits are not calculated into a plan's current liabilities because there is no means of knowing when and if such an event ever will occur. We do not understand why this circumstance need be related to the question of whether such benefits are protected from reduction or elimination.

Appellants suggest that employers will face problems funding for contingent event benefits given that ERISA and the IRC require funding to be based upon reasonable actuarial principles. *See* Appellant Br. at 27 (citing 29 U.S.C. § 1082(c)(3); IRC § 412(c)(3)). But if we concluded that such benefits are not protected by section 204(g) until the contingent event occurs, our result would not alleviate this problem. The problem cited by appellants will exist regardless of whether the contingent event benefit is maintained as a result of the plan's own terms or simply is a product of the operation of section 204(g)'s anti-cutback provisions. Accordingly, the appellants' actuarial and funding arguments

have no bearing on the determination of when contingent event benefits become protected under section 204(g).[16]

When contingent event benefits are provided to continue beyond the normal retirement age, they are an early retirement benefit within the scope of section 204(g) and are accrued benefits within that section. Moreover, under section 204(g), once a benefit is found to meet the definition of a retirement-type subsidy it is to be considered an accrued benefit within that section. Accordingly, for purposes of the anti-cutback provisions of ERISA, such benefits are protected by section 204(g) with respect to employees within the pension plan after their creation and not upon the occurrence of the contingent event.

In this matter, the version of the Westinghouse Plan before its amendment provided that "[a]n Employee ... may *retire*" on the first day of the month following the month in which an employee's employment was terminated as a result of a Permanent Job Separation. *See* Westinghouse Plan § 20.A, J.A. 74. In order to retire after a Permanent Job Separation, an employee must have satisfied one of the age and service combinations set forth below:

— Age 50 or over with 25 or more years of Eligibility Service;
— Age 51 or over with 22 or more years of Eligibility Service;
— Age 52 or over with 19 or more years of Eligibility Service;
— Age 53 or over with 16 or more years of Eligibility Service;
— Age 54 or over with 13 or more years of Eligibility Service;
— Age 55 or over with 10 or more years of Eligibility Service.

*See id.* § 20.B.1.

The amount of monthly pension payable to an employee satisfying the above requirements was the sum of (1) the employee's normal retirement benefit, (2) $10.00 multiplied by the employee's Credited Service, and (3) an additional $100.00 if the employee had 25 years of Eligibility service, and his Special Retirement Date was on or before September 1, 1994. *See id.* § 20.B.2 (a-c). The normal retirement benefit was to be paid for the lifetime of the employee, but the additional dollar amounts were payable only until the employee reached the age of 62.[17] Appellants and amicus argue that none of the benefits provided under the Westinghouse Plan continue beyond normal retirement age. *See* Appellant Br. at 30–34; Amicus Br. at 3–11.

The district court, in addressing this issue stated:

I find that because Subsection 20.B.2 (a) of the pre 1994 version of the Plan provided that the monthly amount of the PJS benefit included 'any amounts computed pursuant to Section 4 of the Plan [the normal retirement pension provision of the Plan]' without any actuarial reduction, even though the participant was retiring at an age which would not normally entitle him or her to the normal retirement pension provided under

---

16. We also note that to the extent the value of the PJS Benefits here is determined in relationship to the normal retirement benefit, they always will be at least partially funded. Thus, the funding concerns appellants raise are not as serious as they would have us believe.

17. Because the $10.00 multiplied by Credited Service and the additional $100.00 benefit do not continue beyond normal retirement age, they cannot properly be considered a retirement-type subsidy as contemplated by section 204(g). Accordingly, those benefits properly could be the subject of amendment or elimination without violating section 204(g). Nei-

ther the district court nor the parties to this appeal have expended much time addressing these benefits. Rather, the parties and the district court focused on the Westinghouse Plan's provision for the payment of normal retirement benefits without any actuarial reduction.

In addition, Bellas did not satisfy the condition set forth in the Westinghouse Plan for receipt of the additional $100.00, namely that he retire on or before September 1, 1994. Because he failed to satisfy the conditions for the benefit, either before or after that amendment, Bellas has no protected right to this benefit under section 204(g). *See* 29 U.S.C. § 1054(g).

the terms of the Plan without any actuarial reduction and further states in Subsection 20.B.3 that '[t]he amount calculated in accordance with Subsection 20.B.2(a) shall be payable for the lifetime of the Employee,' that, at the very least, the amount of the PJS benefit 'computed pursuant to Section 4 of the Plan' (if not the entire PJS benefit) is: (1) a benefit pursuant to which 'more is provided ... than any reasonable actuarial equivalent of the plan's normal retirement benefit' and (2) 'a subsidy that continues after retirement.' Therefore, the PJS benefit is 'a retirement-type subsidy' as that term is used in §§ 204(g) and 411(d)(6). *See Dade,* 68 F.3d at 1562, n. 1; S.Rep. No. 575, 98th Cong., 2d Sess. 30, reprinted in 1984 U.S.Code Cong. & Admin. News 2547, 2576.

In so holding, I obviously disagree with the Defendants' position that the PJS benefit is not a protected retirement-type subsidy because the Plan provides that 'once the employee reached age 65[the normal retirement age under the Plan], this pre-retirement subsidy ceased, and he or she received only the Plan's "normal retirement" benefit. It is a key fact that, when the employee reached age 65, he or she was entitled to nothing more than their normal retirement benefit.' Defendants' Supporting Brief, p. 6. The difficulty I have with the Defendants' argument is that 'Subsection 20.B.3 expressly provides that "[t]he amount calculated in accordance with Subsection 20.B.2(a) shall be payable for the lifetime of the Employee," ' not until the participant turned 65.

*Bellas,* 73 F.Supp.2d at 508–09. The district court is clearly correct that, by its express terms, the Westinghouse Plan provides PJS Benefits that continue for the life of the participant. *See* Westinghouse Plan § 20.B.3.

The appellants and amicus argue that any subsidy provided by the Westinghouse Plan ends when the participant reaches normal retirement age, at which point the participant merely would receive his normal retirement benefit. *See* Appellant Br. at 32. Appellants argue that the PJS Benefits do not provide any increased value to a participant once that participant reaches normal retirement age.

The logic supporting the appellants' argument appears to be as follows. A plan participant is provided with his normal retirement benefit upon becoming entitled to his or her PJS Benefits. A participant would be entitled to this benefit, regardless of the permanent job separation, upon reaching normal retirement age. Accordingly, once a plan participant reaches normal retirement age, he or she is not receiving any increased value as a result of the permanent job separation. Therefore, any subsidy provided by the Westinghouse Plan must be viewed as ceasing upon a plan participant's reaching normal retirement age.

The appellants' argument, however, overlooks one key feature—PJS Benefits provide for the early payment of the normal retirement benefit without actuarial reduction. Normally, the early commencement of retirement benefits would be actuarially reduced. These reduced payments, begun earlier, would continue for life, the idea being that a greater number of smaller payments are actuarially equivalent to a smaller number of larger payments begun at normal retirement age. As mentioned, the Westinghouse Plan does not reduce the normal retirement benefit in the case of PJS Benefits, even though the payment of those benefits may begin as much as 10 years before normal retirement age. Thus, such payments have been subsidized to equal the non-actuarially-reduced normal retirement payment. It is this subsidy that continues for life.

Amicus attempts to buttress appellants' argument that the subsidy does not continue for life. Amicus explains:

Pension benefits ordinarily are actuarially reduced when an employee elects to commence distributions prior to normal retirement age. The reduction is not a penalty; it simply adjusts the vested distributable amount to reflect that (1)

an amount paid currently is worth more than the same amount paid later, (2) the periodic benefit is payable over a greater number of years, and (3) the risk that an employee will die before the payments commence is reduced. The actuarial reduction is calculated by determining the benefit amount that would be payable at normal retirement age (on the basis of the participant's service and compensation to the date of the early commencement), and multiplying the benefit payable at normal retirement age by a discount factor....

For example, a 55–year old employee who terminates employment with a vested monthly retirement benefit of $1,000 for life commencing at age 65 might be entitled to $400 per month for life commencing at age 55 after the actuarial reduction is made. A full actuarial subsidy, such as that provided under the PJS benefit, eliminates this actuarial reduction and so provides an employee with a level stream of benefits before and after normal retirement age, consisting of a monthly $1,000 subsidy until normal retirement age and the monthly $1,000 normal retirement benefit thereafter.

Amicus Br. at 5–6.

Amicus, however, has overstated its case and the data upon which it relies. Under its theory, a plan participant receiving a subsidized early retirement receives payments that consist wholly of the subsidy before retirement age and no subsidy after retirement age. While the data presented by amicus certainly establishes that the total value of the subsidy is less for the person who qualifies for the benefit at an age that is closer to normal retirement age, the data does not support the conclusion that payments made prior to normal retirement age consist wholly of a subsidy.

■ After reviewing the arguments raised by appellants and amicus, and the

language of the Westinghouse Plan, we conclude that the district court correctly concluded that the PJS Benefits in the Westinghouse Plan continue beyond normal retirement age. As noted, the plan itself states that such benefits commence upon the special retirement date and continue for life. Because the Westinghouse Plan provides for a benefit that continues beyond normal retirement age, and is not actuarily reduced by reason of its payment before the normal retirement age, it is a retirement-type subsidy protected by section 204(g) of ERISA. Consequently, to the extent CBS amended the Westinghouse Plan in 1994 to eliminate certain plan participants from eligibility for PJS Benefits, it violated section 204(g).

We note, however, that neither the district court nor any other court or body addressing the issue appears to have drawn a distinction between contingent event benefits that provide for an early retirement and those benefits that provide a retirement-type subsidy. The general practice is to consider the entire benefit provided to be a subsidy. That practice, however, appears to us to be contrary to the definition of retirement-type subsidy that we have adopted. We have considered only the excess in value of a benefit over the actuarial equivalent of the normal retirement benefit to be a subsidy. *See Dade,* 68 F.3d at 1562 n. 1; *Ashenbaugh,* 854 F.2d at 1521 n. 6. Accordingly, to the extent the Westinghouse Plan provided PJS Benefits that were not actuarially reduced, the value of the benefit over and above the actuarially reduced value is a retirement-type subsidy protected by section 204(g). The balance, *i.e.* that portion paid that is equal to the actuarially reduced normal retirement benefit, constitutes an early retirement benefit protected by section 204(g) but is not a retirement-type subsidy.[18]

18. This conclusion is consistent with the terms of the Westinghouse Plan, which defines the PJS Benefits in terms of allowing a plan participant to retire. It is also consistent with GCM 39869, which notes that rather than providing short term benefits to plan participants close to retirement age, a plan may offer an incentive for such participants to retire at the time of the plant shutdown. *See*

Amicus expresses concern that shutdown benefits that have been written into plans on the expectation that they could be modified or removed prior to an actual plant shutdown under the result we reach, will become permanent features of those plans. This result, however, appears to express the intent of ERISA, at least as concerns shutdown benefits that are provided in the form of early retirement benefits or retirement-type subsidies. As noted, one of the purposes of ERISA was to protect an employee's interest in his or her retirement benefits. The "expectation" of companies cannot override the language of the statute.[19]

Additionally, amicus asserts that application of the anti-cutback rule to shutdown benefits prior to the occurrence of the triggering event would expose many plans to the threat of immediate disqualification for federal income tax purposes because adoption of an amendment that violates IRC § 411(d)(6) causes a plan to be disqualified. Amicus further asserts that such disqualification would occur regardless of whether an employer reasonably relied upon GCM 39869. There can be no doubt that these arguments are substantial and we recognize that there may be significant adverse tax consequences as a result of this opinion if relief from sources other than this court is not granted. We hope that the appropriate authorities take note of this problem and take steps to alleviate it. Yet section 204(g), particularly when

considered with the legislative history, compels us to reach our result.

Nevertheless, while we do not suggest that employers have not relied reasonably on GCM 39869, and thus are not entitled to tax relief, we point out that knowledgeable persons in this esoteric field might have been aware since 1989 that section 204(g) was subject to an interpretation contrary to that which the IRS later reached. *See Wallace*, 707 F.Supp. 455. The *Wallace* court issued its opinion more than three years before the IRS published GCM 39869. Further, the Court of Appeals for the Fifth Circuit in 1993 in *Harms*, 984 F.2d 686, and the Court of Appeals for the Ninth Circuit in 1995 in *Richardson*, 67 F.3d 1462, adopted the *Wallace* position.

Finally, amicus asserts that if we affirm the decision of the district court we will discourage employers from adding future shutdown benefits. We think that amicus overstates the impact of our opinion. The only shutdown benefits subject to the anti-cutback provisions under this opinion are those provided in the form of early retirements and retirement-type subsidies that continue beyond normal retirement age. If, notwithstanding this opinion, an employer desires to have the flexibility of providing shutdown benefits that it easily can modify or amend in a qualified plan, it still may provide ancillary shutdown benefits that do not continue beyond normal retirement age. *See, e.g.,* IRC § 1.401(a)(4)–4(3)(2) (defining ancillary

GCM 39869. This is exactly what the Westinghouse Plan provides. Rather than offer some other form of severance to employees that are sufficiently close to retirement age, the Westinghouse Plan allows such employees to retire early. Accordingly, the PJS Benefits provided by the Westinghouse Plan should be viewed as a subsidized early retirement benefit, protected as an early retirement to the extent of the actuarially reduced value of the normal retirement and protected as a subsidy, to the extent the Westinghouse Plan provides a benefit of greater value than the actuarially reduced value of the normal retirement benefit.

19. Other policy concerns militate against accepting the amicus's arguments. The ability

to eliminate or remove a shutdown retirement benefit prior to an actual shutdown seems contrary to the goals of ERISA. If a company could provide for shutdown retirement benefits and then remove them prior to an actual shutdown, it could persuade its employees to stay on board to help overcome difficult financial times, secure in the knowledge that if the company fails they can retire, but nevertheless could remove such benefits when it became evident the company could not be saved. In the absence of ERISA, such actions may not have been legally problematic, but the intent of section 204(g) surely would take this option away from an employer.

benefit to include shutdown benefits not protected under section 411(d)(6)). Accordingly, the amicus's concern does not compel a conclusion different from the one we adopt.

## III. CONCLUSION

For the reasons set forth above, we will affirm the order of the district court entered June 29, 1999. We find that the PJS Benefits offered under the Westinghouse Plan are both an early retirement benefit and a retirement-type subsidy protected under section 204(g), to the extent that they include the lifetime provision of a normal retirement benefit commencing after a covered job loss. To the extent the Westinghouse Plan provided PJS Benefits that did not continue beyond normal retirement age, those benefits are not protected by section 204(g). We will remand the matter to the district court for further proceedings consistent with this opinion.

SHADUR, Senior District Judge, concurring:

Westinghouse Electric Corporation ("Westinghouse") fired its long-term employee Harry Bellas ("Bellas") on December 31, 1997. That was of course within Westinghouse's rights: Under the common law principles of at-will employment, an employer is free to terminate a 32-year employee—just as it is free to terminate a probationary employee with just a few months under his or her belt—for good reason, bad reason or no reason at all. But here it is more than worth noting that there was no Westinghouse "plant shutdown" or any other kind of "shutdown" involved at all—and that is the bizarre mischaracterization that appellants have attached to Bellas' layoff (his firing), and

that has been referred to in the majority opinion at n.4 and then employed throughout the opinion. What or who was "shut down"? Bellas? Surely not.

Most importantly for present purposes, that acceptance of appellants' mischaracterization in the opinion has given them (and the amicus in the case) substantially more than their due, and has thus made the reaching of our panel's conclusions-though clearly correct-needlessly more difficult in terms of analysis. And that has in turn occasioned this separate concurrence.

For appellants to attach the "shutdown" label to Bellas' termination of employment, and then to attempt to use that label as a springboard for a flawed analysis, does more than violate the home truth contained in one of the aphorisms ascribed to Abraham Lincoln:

> If you call a tail a leg, how many legs has a dog? Five? No, calling a tail a leg don't *make* it a leg.

After all, from an employee's perspective the occasion for his or her being fired is irrelevant—in Gertrude Stein terms, "a firing is a firing is a firing."[20] But from an employer's point of view, a plant shutdown is a major economic event (as an individual's layoff, or even a number of individual layoffs, need not be). And of course every employer is well aware of its employee turnover rates, so that although the prospect or timing of any individual employee's termination cannot be predicted, the inevitability of a reasonably anticipatable number of employee terminations can be. And that situation contrasts sharply with an entire plant shutdown, which is almost always an unusual and unpredictable event

---

20. There is no question that Bellas was fired, rather than some more euphemistic term such as "layoff" being applicable to his termination. Bellas' original notice from the employer's Benefits Access Center used the language of his being "involuntarily separated from Westinghouse," which was clear enough on its own, and Westinghouse's ultimate communication (which cut the cord conclusively after a short extension that it had granted

from the original notice date) left no conceivable room for doubt (emphasis added):
> Previously you were notified of *permanent separation* effective August 27, 1997. You were subsequently informed that due to business conditions, your employment was extended.
> This letter is formal notification that your effective date of separation will be December 31, 1997.

(at least far in advance) in a company's economic life.

It is thus no accident, I believe, that when Congress acted to overturn adverse judicial precedent by enacting the Retirement Equity Act (ERISA § 204(g)'s anti-cutback provisions), the Senate Report (which has been quoted in the majority opinion's section captioned *Legislative History of Current Section 204(g)*, and has also been expressly referred to in both *Ross v. Pension Plan For Hourly Employees of SKF Indus., Inc.*, 847 F.2d 329, 333 (6th Cir.1988) and *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 67 F.3d 1462, 1468 (9th Cir.1995)) proceeded to list and explain the types of benefits that an employer *could* continue to control and *could* hence modify despite the Section 204(g) amendment. Importantly, in the course of doing so the Senate Report referred *only* to "a plant shutdown benefit (that does not continue after retirement age)." It did not speak at all of an employer's right to alter such retirement benefits payable on an individual's retirement or other termination.

And it is relatedly worth noting that not one of the three decisions on which appellants seek to rely, and with which our panel has deliberately parted company in substantive terms, involved (as this case does) an individual layoff unassociated with a plant shutdown. Instead the two Court of Appeals decisions, *Ross* and *Roper v. Pullman Standard*, 859 F.2d 1472 (11th Cir.1988)(per curiam), did involve plant shutdowns and the major employee displacements that such events create, while the District Court decision in *Blank v. Bethlehem Steel Corp.*, 758 F.Supp. 697 (M.D.Fla.1990) involved the sale of a facility to a purchaser that did not take over the workforce in toto (thus also being much the equivalent, from the selling employer's perspective, of an unanticipatable plant shutdown).

In sum, the analysis and result that plainly favor Bellas in this case flow easily not only from the facts that the benefits at issue here were framed to continue after retirement age but also from the fact that such benefits are not even hinted at in the Retirement Equity Act or its legislative history as subject to modification by an employer that must deal with the post-statutory termination of an individual employee. Indeed, that conclusion should really follow a fortiori from the majority opinion's decision that the continuation of such a benefit beyond retirement would also insulate a plant shutdown situation from the employer's attempted revision of that retirement benefit.

It is also significant, I suggest, that the General Counsel's Memorandum that was authored by an anonymous Internal Revenue Service lawyer—the GCM on which appellants seek to lay such heavy stress and that the majority opinion properly finds unpersuasive as a substantive matter—becomes an even weaker reed when looked at from the perspective set out here. That GCM speaks of "such shutdown benefits" in the everyday English meaning of an employer's closing of a facility or the like. Westinghouse's effort to bootstrap that notion into applying to every termination of every employee represents an unjustified quantum leap.

It is of course true that Bellas has shaped his Complaint as a putative class action to encompass all participants in the Westinghouse Plan who were laid off after January 1, 1997 under circumstances that meet the pre-Plan Amendment requirements for the type of pension claimed by Bellas, or even to encompass some Plan participants who are still employed. But because this appeal comes before us on an interlocutory basis before the issue of class certification has been addressed by the district court, it cannot now be known (for example) whether Bellas, with his own situation involving an entirely individual firing, would or would not qualify under the Fed.R.Civ.P. 23 standards of typicality or adequacy of representation for a class including such Westinghouse employees who might become affected in the future by a now-purely-hypothetical plant shutdown. Hence our panel's reaching out to address that hypothetical situation poses the prob-

lem always presented by judicial dictum: the prospect that when an actual controversy of that nature presents itself, it may present issues that no one has now anticipated fully, and that could therefore call for a different analysis (or even perhaps a different result).

For those reasons I would limit the present analysis and decision to the one before us in real-world terms: Bellas' individual termination (although I do want to make it clear that my substantive analysis of the hypothetical plant shutdown situation, if we were properly called upon to reach it, would be no different from what has been said in the majority opinion). Accordingly I concur in the majority opinion to the extent of its materially less difficult resolution of the appeal as to Bellas' individual claim.